## EXHIBIT B

## TO

## DECLARATION OF SEAN F. CONNOLLY IN SUPPORT OF DEFENDANT CITY AND COUNTY OF SAN FRANCISCO, CHIEF OF POLICE HEATHER FONG, OFFICER SERNA AND OFFICER ARTIGA'S NOTICE AND MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

ESTHER HWANG,

        Plaintiff,

  vs.                         Case No. C07-02718 MMC

CITY AND COUNTY OF SAN FRANCISCO,
ET AL.,

        Defendants.
_____/

**CERTIFIED COPY**

Deposition of

ESTHER HWANG

Tuesday, April 15, 2008

REPORTED BY:   LESLIE CASTRO, CSR #8876

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

1

1    Q.  And did you plan on meeting people,

2    rendezvousing with people at Dolche or was it just you

3    and Nathan going there?

4    A.  It was just us.

5    Q.  What type of club is Dolche?

6    A.  It's a nightclub.  Mostly dancing, drinking.

7    Q.  Do they serve food?

8    A.  No.

9    Q.  But they have a full bar?

10   A.  Yes.

11   Q.  And how long were you inside of Dolche?

12   A.  Fifteen minutes, maybe twenty.

13   Q.  What did you do during that 15 to 20 minute

14   period of time?

15   A.  Nathan got me a pear cider.  He got a drink

16   for himself.  I don't remember what it was.  And we

17   danced for a little bit.  And it was very -- it was,

18   like, no one there at that time.

19   Q.  Who paid for the drinks?

20   A.  Nathan.

21   Q.  Do you recall how he paid?

22   A.  No.  I wasn't there.

23   Q.  Do you recall how long you danced?

24   A.  About 10 minutes, 10, 15 minutes, the time we

25   were in there.  So I would say in total we were probably

1  there less than a half hour and danced for maybe 10, 15
2  minutes.
3      Q.  And what did you do the rest of the time?
4      A.  Stand around.
5      Q.  Talk?
6      A.  Uh-huh.
7      Q.  Did you have anything else to drink other than
8  the pear cider?
9      A.  No.
10     Q.  And how was that pear cider served?  Was it in
11 a pint glass?
12     A.  Yes.  It was actually -- like, it looks like a
13 beer glass.
14     Q.  Do you know what a pint glass is?
15     A.  I'm not sure.
16     Q.  If you had ordered a beer, would they have put
17 the beer in the same glass?
18     A.  Yes.
19     Q.  Was it 12-ounce?
20     A.  Yes.  And I did not finish my drink.
21     Q.  I haven't asked you that yet.
22     MR. BURRIS:  You will.
23     MR. CONNOLLY:  Well, don't worry.
24     Q.  Why didn't you finish your drink?
25     A.  It didn't taste good.

1    Q.  Had you had one before?

2    A.  No. That was my first pear cider ever.

3    Q.  Why did you order that?

4    A.  I didn't order it.

5    Q.  Nathan ordered it for you?

6    A.  Yes.

7    Q.  What do you normally drink?

8    A.  Back then or now?

9    MR. BURRIS: Then. Then.

10   THE WITNESS: Back then, probably a glass of red

11   wine.

12   MR. CONNOLLY: Q. What do you drink now.

13   A.  I like dirty martinis now. Less calories.

14   Q.  So when you left Dolche, was that to go to the

15   Zebra Lounge?

16   A.  Yes.

17   Q.  And is that when this incident happened?

18   A.  Yes.

19   Q.  So back up a little bit.

20       Once you were at North Beach, there were no

21   other bars that you visited; correct?

22   A.  Correct.

23   Q.  Were you looked like you were about to say

24   something else.

25       Did you visit any other bars or clubs while

1    you were at North Beach that evening?

2    A. No.

3    Q. And you're sure you didn't stop anywhere else

4    before going to North Beach?

5    A. I'm positive.

6    Q. And you're sure you didn't go to any other bar

7    or club or any other establishment that served alcohol

8    before you went to the House of Prime Rib?

9    A. Yes.

10   Q. And you're certain you didn't drink any

11   alcohol at the House of Prime Rib?

12   A. Yes.

13   Q. You're certain the only thing you had to drink

14   at Dolche was part of a glass of pear cider?

15   A. Yes.

16   Q. And how much of that pear cider do you

17   remember drinking?

18   A. About half.

19   MR. CONNOLLY: Let's take a real quick break.

20       (Brief break.) (2:15-2:23)

21   MR. CONNOLLY: Q. Let's go back to the Dolche

22   Lounge with Nathan.

23   You were just describing that part when you left.

24   I have a few follow-up questions.

25   How were you and Nathan getting along at that point

1    A.  You're under arrest.  And then he attacked me.

2    Q.  For no reason?

3    A.  No reason.

4    Q.  Were you standing closer to the building line

5    on the sidewalk or were you standing closer to the

6    street?

7    A.  Standing closer to the street.  But not, like,

8    on the curb, you know.

9    Q.  And you had said something -- what did you say

10   to him again?  You --

11   A.  "I guess you'd have to do something to me if I

12   tried to cross the street."  Because I was looking at

13   all these people cross the street.

14   Q.  Why did you say that to him?

15   A.  Was that a question?  I'm sorry.

16   Q.  Yes.

17   A.  Why did I say that to him?  I don't know.  I

18   wish I didn't.

19   Q.  You wish you hadn't?

20   A.  I really wish I didn't say anything.

21       I felt compelled to talk to him because he was

22   staring at me.  And I've always been friendly with

23   San Francisco police --

24   Q.  So --

25   A.  -- officers, always.

1  Q. Do you remember exactly what you said or is

2  that a the gist?

3  A. That was the gist. I'm paraphrasing.

4  Q. It sounds like a dare.

5  Were you daring him?

6  A. Oh, no. No.

7  Q. Were you testing him? Were you trying to get

8  a rise out of him, trying to provoke him? I'm still

9  trying to understand why you asked the question. You

10 may not have regretted asking it, but why did you ask

11 him?

12 A. I think I was just being funny. Just making

13 conversation.

14 You have to understand -- I don't know if you

15 go out on Broadway past the time of 10:00 p.m. But it's

16 crazy over there and people are constantly crossing the

17 street. And I know it's against the law and Nathan

18 said, "We shouldn't do it." That's fine.

19 But it was -- I was, like, you know, I'm

20 watching people literally cross the street as I'm saying

21 this. So it was just, kind of, funny. Like, not funny

22 I'm sure to him, but I was --

23 MR. BURRIS: You don't know what was funny to him

24 or not. I think you answered the question.

25 THE WITNESS: Okay. Thanks.

1    Q.  Or punch you in any other fashion?

2    A.  No.

3    Q.  Did anyone slap you?

4    A.  No.

5    Q.  Did anyone take out a baton or any other

6  weapon --

7    A.  No.

8    Q.  -- during the incident?

9        Other than the things that you've identified,

10  was there anything else said to you that was threatening

11  or derogatory that you recall?

12    A.  Other than --

13    Q.  The things that you've already identified.

14    A.  No.

15    Q.  Did you -- what we'll do is -- we'll break

16  this down into different parts of the transaction. I

17  want to ask about -- you some follow-up questions on

18  that part. We'll talk about the van ride to the police

19  station and we've covered a lot of what happened

20  afterwards any ways.

21    MR. BURRIS:  Before you go too far into that, I

22  want to take a break.

23    MR. CONNOLLY:  That's fine. That's why I'm

24  outlining it for you. And then we'll talk more about

25  your medical and stuff at the end.

```
 1   STATE OF CALIFORNIA                      )
                                              
 2                                            ) Ss.
                                              
 3   COUNTY OF CONTRA COSTA                   )

 4

 5             I hereby certify that the witness in the

 6   foregoing deposition, named ESTHER HWANG, was by me duly

 7   sworn to testify the truth, the whole truth, and nothing

 8   but the truth in the within-entitled cause; that said

 9   deposition was taken at the time and place therein

10   stated; that the testimony of said witness was reported

11   by me,

12                       LESLIE CASTRO,

13   A Certified Shorthand Reporter and disinterested person,

14   and was thereafter transcribed into typewriting; and

15   that the pertinent provisions of the applicable code or

16   rules of civil procedure relating to the notification of

17   the witness and counsel for the parties hereto of the

18   availability of the original transcript of deposition

19   for reading, correcting and signing have been complied

20   with.

21             And I further certify that I am not of

22   counsel or attorney for either or any of the parties to

23   said deposition, nor in any way interested in the

24   outcome of the cause named in said caption.

25             IN WITNESS WHEREOF, I have hereunto set
```

1  my hand and affixed my seal of office the 27th day of
2  April, 2008 .

*[signature]*

        LESLIE CASTRO
        C.S.R. No. 8876