JOHN L. BURRIS, Esq./ State Bar #69888
BENJAMIN NISENBAUM, Esq./State Bar #222173
LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200          Facsimile: (510) 839-3882
Email: john.burris@johnburrislaw.com
      bnisenbaum@gmail.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER HWANG,<br><br>           Plaintiff,<br><br>      vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; HEATHER FONG, in her capacity as Chief of Police for the CITY AND COUNTY OF SAN FRANCISCO; JESSE SERNA, individually, and in his capacity as a police officer for the CITY AND COUNTY OF SAN FRANCISCO; NELSON ARTIGA, individually and in his capacity as a police officer for the CITY AND COUNTY OF SAN FRANCISCO; and, San Francisco police officers DOES 1-25, inclusive,<br><br>           Defendants.<br><br>                         / | Case No. C 07 2718 MCC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**<br><br>**Time: 9:00 a.m.**<br>**Date: September 12, 2008**<br>**Courtroom 7, 19th Floor**<br><br>Honorable Maxine M. Chesney |

## I.    INTRODUCTION

Plaintiff opposes Defendants' Motion for Summary Judgment, or Partial Summary Judgment, as it relies upon the Court resolving clearly disputed material factual questions in Defendants' favor. More significantly, Defendants' motion fails to address, and does not even inform the Court of

substantial material evidence favorable to Plaintiff. The Court should grant no part of Defendants'
Motion for Summary Judgment.

## II.    TABLE OF CONTENTS

I. Introduction................................................................................................ 1

II. Table of Contents....................................................................................... 2

III. Table of Authorities.................................................................................. 3

IV. Statement of Facts.................................................................................... 4

      Memorandum of Points and Authorities............................................... 13

V. Argument.................................................................................................. 13

    A.  The Summary Judgment Standard ........................................................ 13

    B.  Material Factual Disputes Exist as to Whether Defendants had Probable Cause to
       believe Ms. Hwang was intoxicated in public......................................... 13

    C.  Material Factual Disputes preclude the Court From Granting Defendants Qualified
       Immunity.......................................................................................... 15

    D.  Material Factual Disputes Preclude Defendants' State Law Claim of Immunity......... 16
        i. Government Code section 821.6 does not apply to these circumstances............ 17

    E.  Ms. Hwang can testify about the Severe, Extreme Emotional Distress she suffered
       As a result of the subject-incident arrest, and there is no bar to her recovery............. 18

    F.  Plaintiff has a proper cause of action for violation of Civil Code section 51.7, which
       Also prohibits a violation based on Plaintiff's gender........................................ 18

    G.  Defendant's Motion with Respect to Section 52.1 is baseless and should be denied...... 19

    H.  Again, Immunity under Government Code section 821.6 does not apply to the
       Circumstances in this case, since the claim arises out of the immediate arrest of
       Ms. HWANG, not an investigation................................................................ 20

    I.   There is nothing Generic about Defendant Officer SERNA's History of Complaints,
       and there is No Evidence that Defendant CITY took any remedial action.  The
       evidence establishes that Defendant CITY was well-aware of a known danger to the
       public, yet left that danger in place to attack Ms. HWANG.................................. 21

    J.   Should Ms. HWANG prevail upon her claims, she is entitled to an award of punitive
       Damages............................................................................................. 23

1

VI. Conclusion..................................................................................................23

2

### III.   TABLE OF AUTHORITIES

3

Statutes:

4

California Government Code section 821.6..........................................................17

5

California Government Code section 12926..........................................................19

6

California Civil Code section 51(b)....................................................................18

7

California Civil Code section 52.1................................................................19, 20

8

California Civil Code section 51.7.....................................................................18

9

California Penal Code section 422.56..................................................................19

10

California Penal Code section 647(f)...................................................................15

11

California Penal Code section 836......................................................................14

12

California Penal Code section 847......................................................................17

13

Cases:

14

*Bell v. Cameron Meadows Land Co.* 669 F.2d 1278 (9th Cir. 1982)........................13

15

*Ruffin v. County of Los Angeles* 607 F.2d 1276 (9th Cir. 1979)............................13

16

*United States v. Diebold* 369 U.S. 654, 82 S.Ct. 993, (1962)................................13

17

*Sankovich v. Life Ins. Co. of N. Am.* 638 F.2d 136 (9th Cir. 1981).........................13

18

*Southwest Marine, Inc. v. Gizoni* 112 S. Ct. 486 (1991)....................................13.

19

*United States v. Moses* 796 F.2d 281 (9th Cir. 1986)...................................... 13

20

*People v. Gomez* 63 Cal.App.3d 328 (1976)....................................................14

21

*In re William G.* 107 Cal.App.3d 210, 165 Cal.Rptr. 587 (1980)...........................15

22

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)...........................17, 20

23

*Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101 (E.D. Cal. 2005)....................17, 20

24

*Austin v. Escondido Union Schl. Dist.*, 149 Cal. App. 4th 869 (2007)......................19

25

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F. Supp. 2d 1084,

26

    (N.D. Cal. 2005)...................................................................................20

27

*Gillette v Delmore*, 979 F2d 1342 (9th Cir 1992)............................................21

28

*Nadell v Las Vegas Metro Police Dept*, 268 F3d 924, 930 (9th Cir 2001)...........................21

1  *Gomez v Vernon*, 255 F3d 1118 (9th Cir 2001) ............................................................21
2  *Henry v County of Shasta*, 132 F3d 512 (9th Cir 1997).............................................21

## IV.    STATEMENT OF FACTS

On May 12, 2007,  at about 7:30 p.m., Plaintiff ESTHER HWANG and her then boyfriend, Nathan Flores, had dinner at the House of Prime Rib with Ms. HWANG's family. Ms. HWANG and Mr. Flores had just finished law school final exams...(Exh. A, Nisenbaum Declaration, p. 145:20-147:9). Ms. HWANG drank no alcohol in the several hours preceding dinner at the House of Prime Rib. (Exh. A, Nisenbaum Declaration, p. 147:11-148:7). At the family dinner at the House of Prime Rib, Ms. HWANG did not drink any significant amount of alcohol and was not intoxicated. (Exh. A, Nisenbaum Declaration, Hwang depo, p. 153:18-154:25; Exh. B, Nisenbaum Declaration, Daniel Hwang p. 23:4-10; 25:10-14; 27:7-21; 29:1-5; 35:24-36:13; Exh. C, Nisenbaum Declaration, Lim depo p. 31:16-33:18).

After dinner, Ms. HWANG and Mr. Flores decided to go to North Beach. Mr. Flores drove himself and Ms. HWANG to North Beach, where he valet-parked at a parking lot on Broadway. (Exh. A, Nisenbaum Declaration, p. 155:17-156:13). Ms. HWANG and Mr. Flores then went to "Dolche", which is a nightclub with drinking and dancing. Ms. HWANG and Mr. Flores had no plans to rendezvous with other people, and were at Dolche for about 15 to 20 minutes. While at Dolce, Mr. Flores bought Ms. HWANG a single drink consisting of a pear cider. Ms. HWANG and Mr. Flores danced for about 10 to 15 minutes, and otherwise stood around and talked. Ms. HWANG had no drink other than the single pear cider. (Exh. A, Nisenbaum Declaration, p. 156:14-158:9). Ms. HWANG and Mr. Flores did not go to any other bars or clubs that night. (Exh. A, Nisenbaum Declaration, p. 159:20-160:9).

While at Club Dolche, Ms. HWANG talked to a bouncer for Dolche named Mirko Buchwald. Ms. HWANG knows Mr. Buchwald as a bouncer at many different clubs and promotions where she would see him. (Exh. A, Nisenbaum Declaration, p. 162:12-164:2). Mr. Buchwald is also a martial arts instructor and Ms. HWANG has taken a non-contact self-defense course, fitness kickboxing, taught by Mr. Buchwald. (Exh. A, Nisenbaum Declaration, p. 164:23-25, Exh. D, Nisenbaum

1   Declaration, p. 30:22-32:22). Mr. Buchwald has a couple of martial arts schools in San Francisco
2   (Exh. D, Nisenbaum Delcaration, Buchwald depo. p. 9:20-25). Mr. Buchwald has trained with and
3   taught police officers at his martial arts schools. (Exh. D, Nisenbaum Declaration, p. 21:15-22:10).

4       Mr. Buchwald observed and conversed with Ms. HWANG when she was at Dolche shortly before
5   the incident and also observed portions of the subject-incident arrest of Ms. HWANG. Mr. Buchwald
6   was working as the doorman at club Dolche when Ms. HWANG and Mr. Flores arrived. Mr.
7   Buchwald's duties included controlling the amount of people who came into the club. Mr. Buchwald
8   was employed directly by the club. (Exh. D, Nisenbaum Declaration, p.  42:25-44:19). The club was
9   not busy when Ms. HWANG and Mr. Flores arrived. (Exh. D, Nisenbaum Declaration, p. 45:5-6).
10  Mr. Buchwald engaged in small talk with Ms. HWANG when she first arrived, during which Ms.
11  HWANG told him that she and Mr. Flores were celebrating law school graduation. (Exh. D,
12  Nisenbaum Declaration, p. 45:21-46:8). It did not appear to Mr. Buchwald that Ms. HWANG had
13  been drinking, and Mr. Buchwald smelled no alcohol coming from Ms. HWANG. From working at
14  niteclubs, Mr. Buchwald has extensive experience in recognizing people who appear to have been
15  drinking excessively. (Exh. D, Nisenbaum Declaration, p. 46:9-47:4).

16      Mr. Buchwald saw Ms. HWANG inside Club Dolche when he walked through the club, and
17  conversed with Ms. HWANG further when she left Club Dolche. (Exh. D, p. 47:19-48:17). Based on
18  Mr. Buchwald's observations, when Ms. HWANG left the club, her demeanor appeared fine and she
19  did not appear intoxicated or drunk. (Exh. D, Nisenbaum Declaration p. 75:5-16). When Ms.
20  HWANG left Club Dolche, she asked Mr. Buchwald if she and Mr. Flores could leave their jackets at
21  the coat check for Club Dolche while they went across the street. (Exh. D, Nisenbaum Declaration,
22  p. 48:14-49:1).

23      After Ms. HWANG and Mr. Buchwald had this conversation, he observed Ms. HWANG and Mr.
24  Flores walked down Broadway toward a liquor store. They were about 20 feet from Mr. Buchwald
25  and stood in the street, according to Mr. Buchwald, as if they were about to cross Broadway where
26  there was no crosswalk. (Exh. D, Nisenbaum Declaration, p. 49:16-51:15). Ms. Hwang and Mr.
27  Flores stood off the sidewalk for less than one minute, according to Mr. Buchwald, before Mr. Flores
28  walked back to the front door of Club Dolche and asked if he could retrieve their coats from Club

1  Dolche because he and Ms. HWANG had decided to leave. Mr. Flores went inside the club to
2  retrieve the jackets. (Exh. D, Nisenbaum Declaration, p. 52:4-53:12). Ms. HWANG testified that as
3  she and Mr. Flores were about to cross the street, Mr. Flores stopped after he had about one foot off
4  the curb, looked around and told her that they should not jaywalk. Ms. HWANG was holding Mr.
5  Flores' hand, and he was leading her when he stopped.  Ms. HWANG never set foot in the street, and
6  Mr. Flores' stopped the intended street crossing after he noticed that there were a number of police
7  officers nearby. (Exh. A, Nisenbaum Declaration, p. 173:5-176:1).

8      After deciding not to cross the street, Ms. HWANG walked over to the liquor store, which was a
9  couple of doors down from Dolce, where Ms. HWANG purchased a pack of cigarettes. Ms. HWANG
10  was by herself when she bought cigarettes at the liquor store.  After exiting the liquor store, Ms.
11  HWANG lit a cigarette outside the liquor store, while she waited for Mr. Flores to retrieve their coats
12  from Dolce. (Exh. A, Nisenbaum Declaration, p. 177:11-178:21).

13      While Mr. Flores went to get the coats at Dolce, Ms. HWANG began to smoke a cigarette and
14  smiled at one of the several police officers who Mr. Flores had noted were standing by when he
15  decided crossing the street would be a bad idea. The officer Ms. HWANG smiled at and said "Hello"
16  to stood apart from the other officers. Ms. HWANG was trying to be nice and friendly, and make
17  small talk with the officer. Plaintiff later learned this officer was Defendant Officer SERNA. (Exh.
18  A, Nisenbaum Declaration, p. 181:20-183:17). Ms. HWANG was about three to four feet away from
19  Defendant Officer SERNA when she told him, flirtatiously, "I guess, you'd have to do something to
20  me if I tried to cross the street." Defendant Officer SERNA then told Ms. HWANG she was under
21  arrest and attacked her. (Exh. A, Nisenbaum Declaration, p. 187, 10-188:3; 182:19-183:4). At the
22  time she made the statement to the officer, several people were in fact crossing the street. (Exh. A,
23  Nisenbaum Declaration, p. 188:9-18; 189:7-22). Ms. HWANG, however, was on the sidewalk and
24  had made no motion indicating that she was about to cross the street. (Exh. A, Nisenbaum
25  Declaration, p. 188:4-8; 190: 1-8).   Ms. HWANG did nothing that would reasonably cause
26  Defendant Officer SERNA to attack her. (Exh. A, Nisenbaum Declaration, p. 194:18-22).

27      Defendant Officer SERNA grabbed Ms. HWANG's arm and pulled it. Another officer came
28  behind Ms. HWANG. Defendant Officer SERNA pulled Ms. HWANG's hair, yanked it hard

1   backward from the base of Ms. HWANG's skull, and screamed in Ms. HWANG's face "You fucking
2   cunt!" (Exh. A, Nisenbaum Declaration, p. 195:16-196:3, 198:1-22). Defendant Officer ARTIGA
3   was the other officer who came behind Ms. HWANG. (Exh. A, Nisenbaum Declaration, p. 197:9-
4   13). When Defendant Officer ARTIGA arrived from behind Ms. HWANG, Defendant Officer
5   SERNA used the same slur again, this time yelling at Ms. HWANG: "You stupid fucking cunt!"
6   (Exh. A, Nisenbaum Declaration, p. 200:5-14). Ms. HWANG did not resist the officers. She stepped
7   backward to keep from falling after being yanked. Ms. HWANG did not intentionally try to step on
8   any officer's foot. (Exh. A, Nisenbaum Declaration, p. 201:5-202:12). Defendant Officer SERNA
9   yanked Ms. HWANG down to the ground by the back of her hair, so that Ms. HWANG landed on her
10  butt and back on the cement. Defendant Officer SERNA then released Ms. HWANG's hair. (Exh.
11  A, 203:6-204:3). Defendant Officer ARTIGA then handcuffed Ms. HWANG. (Exh. A, p. 204:6-14).
12      Mr. Buchwald observed Ms. HWANG, just before the use of force by Defendants, as she began
13  talking to a police officer. According to Mr. Buchwald, Ms. Hwang and Mr. Flores had been standing
14  in the street, about 6 to 8 feet from the sidewalk, and were not blocking traffic. (Exh. A, 73:24-
15  74:18). He observed Ms. HWANG speak briefly to the officer and the officer suddenly grabbed Ms.
16  HWANG's arm and put it behind her back. (Exh. D, Nisenbaum Declaration, p. 53:6-56:5). At the
17  time the officer grabbed Ms. HWANG's arm, she was on the sidewalk, having a conversation with
18  the officer and appeared to be a normal distance from the officer as one who would be having a
19  normal conversation with another person. Other police officers were in the vicinity a few feet away.
20  Ms. HWANG was having a normal conversation with the officer when the officer quite suddenly
21  pulled Ms. HWANG's arm behind her back and took her to the ground, where she landed in a seated
22  position. (Exh. D, Nisenbaum Declaration, p. 57:1-58:24, 75:25-76:5). Mr. Buchwald observed that
23  Ms. HWANG and the officer appeared to be having a normal conversation, and Ms. HWANG did not
24  appear to be acting aggressively toward the officer or yelling at the officer. (Exh. D, Nisenbaum
25  Declaration, p. 74:19-75:14). Mr. Buchwald does not recall exactly how Ms. HWANG was put on
26  the ground, as his first instinct was to look away and not be involved. (Exh. D, Nisenbaum
27  Declaration, p. 58:9-24). Ms. HWANG's top came down during the arrest, exposing her breasts.
28  (Exh. D, Nisenbaum Declaration, p. 59:16-61:15). Mr. Buchwald observed that Ms. HWANG

1   appeared to look distressed after the use of force and arrest. The use of force Mr. Buchwald observed
2   was a sudden and sharp grabbing and yanking of Ms. HWANG's arm behind her back. (Exh. D,
3   Nisenbaum Declaration, p. 63:18-65:7). Mr. Buchwald did not see Ms. HWANG kick any police
4   officer (Exh. D, Nisenbaum Declaration, p. 68:22-69:6).

5       Defendant Officer ARTIGA prepared a police report of the incident, which is attached as Exhibit
6   E to the accompanying Declaration of Benjamin Nisenbaum. In that report, Defendant Officer
7   ARTIGA stated: "Based on Hwang's violent and belligerent behavior, Officer Serna executed a hair
8   pull takedown on Hwang to prevent Hwang's assaultive behavior, while I secured both of her wrists
9   in handcuffs and her right wrist with a rear wrist lock." (Exh. E, Nisenbaum Declaration, page 4 of 5,
10  bates-stamped CCSF 0004, paragraph 3).

11      Ms. HWANG's hair had been down that day. (Exh. F, Nisenbaum Declaration, p. 128:17-
12  129:19). Mr. Flores returned from getting the coats from coat-check and saw Ms. HWANG sitting on
13  the sidewalk, with her hands cuffed behind her back. (Exh. F, Nisenbaum Declaration, p. 123:2-25).
14  Mr. Flores saw police officers standing in the vicinity of Ms. HWANG. (Exh. F, Nisenbaum
15  Declaration, p. 124:16-125:17). According to Mr. Flores, Ms. HWANG began squirming around on
16  the ground and tried to get up, while still in handcuffs. According to Mr. Flores, at this point
17  Defendant Officer SERNA grabbed Ms. HWANG by the hair. Both Defendant Officers SERNA and
18  ARTIGA grabbed Ms. HWANG, at separate times, while she was handcuffed. Mr. Flores objected to
19  the manner in which the two defendant officers were speaking to Ms. HWANG, and told the officers
20  that it was inappropriate to speak to her that way. (Exh. F, Nisenbaum Declaration, p. 133:9-134:22).
21  Defendant Officer SERNA then ordered Mr. Flores to step away. At that point, Mr. Flores observed
22  Defendant Officer ARTIGA grab Ms. HWANG and say something to her that he could not hear.
23  (Exh. F, Nisenbaum Declaration, p. 134:14-22). Ms. HWANG was seated at the time Mr. Flores
24  observed her hair being grabbed. (Exh. F, Nisenbaum Declaration, p. 135:11-136:11). According to
25  Mr. Flores, the officer pulled Ms. HWANG's head backward by her hair and said to Ms. HWANG
26  "Sit down you fucking cunt." Mr. Flores believed that the officer who made this statement to Ms.
27  HWANG is Defendant Officer ARTIGA, but allowed that it could have been Defendant Officer
28  SERNA. (Exh. F, Nisenbaum Declaration, p. 136:9-137:25).

1    Ms. HWANG was not intoxicated on the night of the subject-incident. Ms. HWANG hardly

2  drank that night. After she was arrested, Ms. HWANG suffered an anxiety attack while she was in

3  jail. (Exh. A, Nisenbaum Declaration, p. 240:19-241:4).

4    Mr. Flores and Ms. HWANG ended their romantic relationship in October or November of 2007.

5  The romantic relationship ended when Ms. HWANG broke up with Mr. Flores, in part because she

6  felt he abandoned her after the subject-incident arrest. (Exh. F, Nisenbaum Declaration, p. 46:2-

7  47:10).

8    Eugene Ainsworth, the witness relied on by defendants who spends his nights at the local liquor

9  store Ms. Hwang bought cigarettes at, is familiar with both Defendant Officers SERNA and

10  ARTIGA. According to Mr. Ainsworth, "These officers were on Broadway only because Broadway

11  has gotten so out of hand at times that they needed extra officers out there." (Exh. G, Nisenbaum

12  Declaration, p. 50:24-52:18). Mr. Ainsworth is also totally blind in his right eye. (Exh. G,

13  Nisenbaum Declaration, p. 43:16-44:2).

14    Defendant Officer SERNA has been a defendant in numerous civil lawsuits filed in the United

15  States District Court for the Northern District of California. Plaintiff's counsel represents two other

16  people who suffered excessive force and false arrest by Defendant Officer SERNA. Gregory Oliver,

17  II, filed a civil lawsuit against Defendant Officer SERNA in this court on May 8, 2007, only four

18  days before the subject-incident against Plaintiff HWANG. Mr. Oliver's complaint is attached to the

19  accompanying Declaration of Benjamin Nisenbaum as Exhibit H. Mr. Oliver alleged that on August

20  20, 2006, at about 1:45 a.m., he was in North Beach in the vicinity of Broadway and Kearny Street,

21  when Defendant Officer SERNA struck him with a police baton twice and then grabbed him by the

22  neck and shirt. Mr. Oliver was thrown to the ground and struck numerous times by a group of San

23  Francisco police officers. Mr. Oliver had committed no crime and only attempted to point out to

24  officers that they were using force against a person who had been the victim of an earlier crime.

25  (Exh. H, Nisenbaum Declaration, p. 3:3 – 4:4).

26    On October 29, 2006, Marco Maestrini also suffered excessive force and false imprisonment

27  committed by Defendant Officer SERNA. Mr. Maestrini alleged in his initial Complaint (attached to

28  the accompanying Declaration of Benjamin Nisenbaum as Exhibit I), which was filed in this Court on

1  June 6, 2007, that while on Broadway in North Beach, Defendant Officer SERNA attacked him after
2  Mr. Maestrini noticed several officers beating up another person. Mr. Maestrini and a friend asked
3  the officers what was going on, and Defendant Officer SERNA grabbed Mr. Maestrini from behind
4  and slammed him against a parked paddy wagon, while repeatedly telling him to "Shut up!"
5  Defendant Officer SERNA struck Mr. Maestrini on the head and slammed him to the ground. Later,
6  while Mr. Maestrini was detained and awaiting an ambulance to take him to the hospital for treatment
7  of injuries inflicted by Defendant Officer SERNA, he asked SERNA why he was being detained.
8  Defendant Officer SERNA told Mr. Maestrini, in a surly tone, "Oh, you're crying like a little girl."
9  (Exhibit I, Nisenbaum Declaration, p. 3:9-4:8). About two to three months after the October 29, 2006
10  incident, Mr. Maestrini filed a complaint with the Office of Citizen Complaints regarding that
11  incident. (Exhibit I, Nisenbaum Declaration, p. 4:18-24). Also included in Exhibit I is a copy of the
12  police report pertaining to the arrest of Mr. Maestrini, and photographs of injuries to Mr. Maestrini's
13  head sustained from the use of force against him. According to Defendant Officer SERNA, Mr.
14  Maestrini fell to the ground. Based on the several different injuries to different sides of Mr.
15  Maastrini's head, Defendant Officer SERNA's account of that incident is, on its face, highly unlikely.

16      As this Court is aware, Plaintiff's counsel has attempted to relate both the instant-matter and the
17  *Maestrini* matter to the *Oliver* matter, which was filed before the instant case and *Maestrini*. The list
18  of cases against Defendant Officer SERNA, and the notice that Defendant CITY had and ignored
19  regarding the danger posed to members of the public by Defendant Officer SERNA, particularly
20  those in North Beach at night, extensively predates the victimization of Ms. HWANG by Defendant
21  Officer SERNA.

22      On November 26, 1997, Defendant CITY removed a lawsuit filed in Superior Court against
23  Defendants CITY and SERNA to this Court in *Green v. San Francisco, City, et al.* case no. 3:97-cv-
24  04310 THE. That matter was dismissed on January 15, 1999, after a settlement conference resolved
25  the matter on December 10, 1998. The civil docket in that civil rights case is attached as Exhibit J to
26  the accompanying Declaration of Benjamin Nisenbaum.

27      On January 30, 1998, Defendant CITY removed a lawsuit filed in Superior Court against
28  Defendants CITY and SERNA, among others, to this Court in *Lewis v. SF City and County, et al.*

case no. 3:98-cv-00351 TEH. That civil rights matter eventually resulted in a defense verdict in favor of Defendant CITY, SERNA and another officer on September 5, 2000. The civil docket in that civil rights case is attached as Exhibit K to the accompanying Declaration of Benjamin Nisenbaum.

On April 20, 1998, a Complaint was filed in this Court in *Pasene v. City and County of SF, et al.,* case no. 3:98-cv-01610 MMC in which Defendant SERNA was a named defendant, among other officers. That civil rights case resolved on July 28, 1999. The civil docket in that civil rights case is attached to the accompanying Declaration of Benjamin Nisenbaum as Exhibit L.

On February 15, 2000, a Complaint was filed in this Court in *Duthie, et al. v. San Francisco C&C, et al,* case no. 3:00-cv-00539 MEJ, in which Defendant Officer SERNA was a named defendant. That civil rights case settled with respect to Defendant CITY on December 13, 2002, leaving only a private defendant, "Polly Esther's Night." The civil docket in that civil rights case is attached as Exhibit M to the accompanying Declaration of Benjamin Nisenbaum

On April 28, 2000, Defendant CITY removed a lawsuit filed in Superior Court against Defendant Officer SERNA and several other individually-named officers to this Court in *Bell, et al. v. Serna, et al.,* case no. 3:00-cv-01501 WHO. That civil rights matter eventually resulted in a settlement on December 28, 2000. The civil docket in that civil rights case is attached as Exhibit N to the accompanying Declaration of Benjamin Nisenbaum.

Merhdad Alemozaffar filed a lawsuit in this Court in *Alemozaffar v. City and County of San Francisco, et al.,* Case No. 3:07-cv-04494 JSW, which alleged that on December 17, 2006, Mr. Alemozaffar was tackled, his arms were restrained by nylon restraints, and he was repeatedly jolted with a Taser stun gun, after Mr. Alemozaffar told Defendant SERNA that he was going to report him to his superiors for calling him a girl. The Joint Case Management Conference statement in that civil rights case is attached as Exhibit O to the accompanying Declaration of Benjamin Nisenbaum.

Defendant Officer SERNA is a named Defendant in two other pending lawsuits in this Court. In *Jamal Jackson, et al. v. City and County of San Francisco, et al,* Case No. 4:08-cv-01916 SBA, Defendant Officer SERNA is accused of assaulting and battering Jamal Jackson on February 24, 2007, after Defendant Officer SERNA placed Mr. Jackson in handcuffs. The Complaint in that civil rights action is attached as Exhibit P to the accompanying Declaration of Benjamin Nisenbaum.

1    In *Shawn Myers, et al. v. City and County of San Francisco, et al,* Case No. 3:08-cv-01163 MEJ,
2    which is a companion case to *Jamal Jackson,* arising out of the same incident on February 24, 2007,
3    Defendant Officer SERNA is accused of using excessive force against and falsely arresting Shawn
4    Myers. When Mr. Myers' wife, co-plaintiff Sarah Myers, asked why force was being used against
5    her husband, Defendant Officer SERNA discharged O.C. spray into her face. Defendant Officer
6    SERNA is also accused of using slurs in that case, including calling Mr. Myers a "monkey," saying
7    that "monkeys should be kept in cages" and calling Mrs. Myers an "ugly white woman." The
8    Defendant Officers in that case are accused of lying by claiming in their police reports that Mr.
9    Myers had resisted arrest, assaulted and battered the officers, and that Mrs. Myers had attempted to
10   assault and batter Defendant Officer SERNA. The Complaint in that civil rights case is attached as
11   Exhibit Q to the accompanying Declaration of Benjamin Nisenbaum.

12    In *Oliver, Id,* Plaintiff's counsel brought a Motion to Compel Production of Documents pertaining
13   to Defendant Officer SERNA's personnel records. As the Court is aware, the parties have agreed to
14   use Magistrate Judge Larson's Order on Plaintiff's Motion to Compel in *Oliver* as a guideline for
15   Defendant CITY's Production of personnel and internal records pertaining to Defendants SERNA
16   and ARTIGA in the instant case. Magistrate Judge Larson ordered the contents of 24 files pertaining
17   to Defendant SERNA to be produced. Potentially, production of three other internal files pertaining
18   to Defendant SERNA may be ordered when those investigations are completed. Magistrate Judge
19   Larson's Order is attached as Exhibit R to the accompanying Declaration of Benjamin Nisenbaum.

20    To date, Defendants in the instant case have disclosed no evidence of any action taken with
21   respect to any of the allegations of misconduct against Defendant Officer SERNA as identified
22   herein. Defendants have produced no evidence to indicate whether these allegations of misconduct
23   against Defendant Officer SERNA were investigated, or whether Officer SERNA was disciplined.
24   Defendants leave only the inference that Defendant CITY took no action whatsoever in the face of
25   numerous prior allegations of misconduct against Defendant Officer SERNA, thereby leaving him
26   undisciplined, on the street, in a high-risk environment, in the night club district of North Beach, to
27   abuse Ms. HWANG and others with impunity, and to then blame each victim, just as he appears to
28   have done in so many other reported instances.

# MEMORANDUM OF POINTS AND AUTHORITIES
## V.    ARGUMENT

### A. THE SUMMARY JUDGMENT STANDARD.

Summary judgment requires that the moving party show there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Bell v. Cameron Meadows Land Co.* 669 F.2d 1278 (9th Cir. 1982). The relevant disputed facts must be considered in the light most favorable to the non-moving party and all relevant disputed matters resolved in the non-moving party's favor. *Ruffin v. County of Los Angeles* 607 F.2d 1276, 1279 (9th Cir. 1979); in *United States v. Diebold* 369 U.S. 654, 655, 82 S.Ct. 993, (1962) wherein the Court held "on summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."

The Court should not grant summary judgment where there are undisputed facts which reasonably lend themselves to different inferences. *Sankovich v. Life Ins. Co. of N. Am.* 638 F.2d 136 (9th Cir. 1981). Further, it is not the trial court's function to resolve any genuine factual issue at the summary judgment hearing. *Southwest Marine, Inc. v. Gizoni* 112 S. Ct. 486 (1991).

### B. MATERIAL FACTUAL DISPUTES EXIST AS TO WHETHER DEFENDANTS HAD PROBABLE CAUSE TO BELIEVE THAT MS. HWANG WAS INTOXICATED IN PUBLIC.

"[P]robable cause to arrest arises when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Moses* 796 F.2d 281, 283 (9th Cir. 1986); and "… whenever the following circumstances occur: (1) The officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence…" Cal. Penal Code section 836(a)(1). Probable cause for a warrantless arrest exists where the facts and circumstances known to the arresting officer would cause a man of ordinary care and prudence to believe and to conscientiously entertain an honest and strong suspicion that an offense has been committed and that the accused is guilty thereof. *People v. Gomez* 63 Cal.App.3d 328, 333 (1976).

In the instant matter, Defendants say one thing, while Ms. HWANG and an independent witness, Mierko Buchwald, contradict Defendants. According to Plaintiff, she was not intoxicated during the subject incident or leading to it. According to Mr. Buchwald, who clearly has significant experience in recognizing intoxicated people, Ms. HWANG did not appear intoxicated or drunk at all. In fact, she seemed fine. Both witnesses relied on by Defendants have axes to grind: Mr. Flores is Ms. HWANG's ex-boyfriend, having been dumped by Ms. HWANG. Mr. Ainsworth, whose visual perception is questionable since he is blind in one eye, exhibits a bias in favor of police officers and against people who go to nightclubs in North Beach. Mr. Buchwald has no such ax to grind, and can only put himself at risk by testifying in favor of Ms. Hwang, since Mr. Buchwald works at clubs in North Beach.

As testified to by Plaintiff, she was not intoxicated and posed no danger to herself or anyone when she tried to strike up a conversation with Defendant Officer SERNA. It is no crime to attempt to make casual conversation with a police officer, with no intent to interfere with the officer's job, and no officer could reasonably believe that any such action is a crime. Mr. Buchwald's testimony corroborates Ms. HWANG's account of what occurred leading to the use of force and arrest of Ms. HWANG, as well as her lack of intoxication. Defendants cavalierly assert that no reasonable jury could believe Ms. HWANG, and by implication Mr. Buchwald. Defendants have no independent, objective evidence to undermine Plaintiff's and Mr. Buchwald's account. For example, there is no evidence of any breath or blood test to show that Plaintiff was intoxicated. Defendants instead request the Court resolve this factual conflict in Defendants' favor. In the light viewed most favorably to Plaintiff, Defendant Officer SERNA committed serious crimes against Plaintiff, while Plaintiff was not intoxicated or otherwise subject to arrest because there was no cause to believe she had committed any crime, and Defendant CITY was grossly, deliberately indifferent to the known risk of harm that Defendant SERNA posed to members of the public, especially in the area of North Beach at night. Since the Court cannot, on a motion for summary judgment, resolve material factual disputes, Defendants' instant motion is baseless..

*In re William G.* 107 Cal.App.3d 210, 165 Cal.Rptr. 587 (1980) and the other cases relied on by defendants are distinguishable from this case. *In re William G, Id,* at 214, addressed the sufficiency of evidence to support a conviction. In that case, the appellant contended that the record contained no evidence that the minor defendant was unable to take care of himself, which would have been required to support a conviction under section 647(f). Although the minor defendant's friend offered contrary evidence, the officer who arrested the appellant testified that the appellant was staggering very badly, was unsteady on his feet, had slurred speech, bloodshot eyes, and a strong odor of alcohol emanating from his person. Obviously, this evidence is sufficient, if a fact-finder were to believe that it was true even in the face of contrary evidence, to support a conviction of public intoxication. In the cases cited by defendants, these relevant facts were evaluated and a factual determination was made. This is the province of the jury in the instant case.

One material factual question in the instant case that is appropriate for a trier of fact to determine is whether Ms. HWANG actually did appear to be intoxicated, or to have the symptoms of intoxication alleged by the Defendants, but which symptoms are expressly denied by Ms. HWANG and an independent witness, Mr. Buchwald.

Although Defendants assert that the record as a whole indicates that Ms. HWANG was publicly intoxicated, Defendants do not present the Court with an accurate or complete record to support such a claim. Defendants omit Mr. Buchwald's testimony and Ms. HWANG's own testimony which fundamentally contradicts this assertion by Defendants.

The same is true if Defendants were to specifically assert that Ms. HWANG was unable to care for herself. This is a straightforward factual dispute case.

## C. THE MATERIAL FACTUAL DISPUTES PRECLUDE THE COURT FROM GRANTING DEFENDANTS QUALIFIED IMMUNITY.

Defendants assert that they are entitled to qualified immunity even if Ms. HWANG was not actually intoxicated, because, they claim, their mistaken belief that Ms. HWANG was intoxicated was reasonable based upon the alleged facts they claim they observed, which are the same disputed facts upon which they contend that there was probable cause to arrest Ms. HWANG.

The same factual disputes that preclude the Court from granting the Defendants' motion with respect to probable cause also preclude the Court from granting Defendants' motion with respect to qualified immunity. According to Ms. HWANG and Mr. Buchwald, Ms. HWANG did not exhibit the behavior alleged by Defendants. Mr. Buchwald in particular notes that Ms. HWANG did not appear to be intoxicated. In fact, she appeared fine to Mr. Buchwald. Her demeanor was that of having a casual conversation with a police officer, which suddenly twisted when the officer grabbed Ms. HWANG. This is also what Ms. HWANG describes.

Defendants assert the rule of qualified immunity, but they assert no basis for qualified immunity for police officers who lie about or fabricate the material bases upon which a person is arrested. Indeed, if a fact-finder determines that Ms. HWANG did not exhibit objective symptoms of intoxication, that she was not drunk or intoxicated in public, and did not otherwise violate the law or reasonably appear to violate the law, then there can be no qualified immunity for the Defendants.

Even where Defendants contend that Ms. HWANG jay-walked, there is no evidence that she did jaywalk. According to Ms. HWANG, she was never even in the street. According to Mr. Buchwald, Ms. HWANG was a few feet off the sidewalk, but never blocked traffic and never crossed the street. The defendants make no claim that Ms. HWANG ever jaywalked or crossed the street. Instead, they contend that they told Ms. HWANG not to jaywalk, and, according to the defendants, Ms. HWANG did not jaywalk. Counsel is unaware of any crime of "attempted jaywalking" or "intent to jaywalk". Counsel submits to the Court that there are no such criminal offenses.

## D. THE MATERIAL FACTUAL DISPUTES PRECLUDE DEFENDANTS' STATE LAW CLAIM OF IMMUNITY.

As shown herein, material factual disputes exist sufficient to overcome Defendants' assertion that they had probable cause to arrest Ms. Hwang. Since substantial evidence exists, in particular Plaintiff's and Mr. Buchwald's deposition testimony, that supports Plaintiff's contention that not only was she not intoxicated, but also that she did not appear to be intoxicated, Defendants are not immune under Penal Code section 847. Section 847 immunity requires that Defendants had reasonable cause to believe that Ms. HWANG had committed a criminal offense. Under the facts testified to by Plaintiff and Mr. Buchwald, as discussed herein, Plaintiff had committed no crime (not even jaywalking), and did not appear to be intoxicated. Defendants' instant motion presumes the

contested truth of the Defendants' claims, when the material facts are in clear dispute. In the light most favorable to Plaintiff, Defendants had no reasonable cause to believe that Ms. HWANG had committed any crime, and are therefore liable for false arrest.

i.    **Government Code section 821.6 immunity does not apply to these circumstances.**

Defendants contend that the Defendants Officers' conduct at issue occurred during their investigation of Ms. HWANG's alleged criminal actions, and thus, they are immune pursuant to Government Code section 821.6. However the type of conduct the Defendants Officers are accused of "is not the sort of conduct to which Section 821.6 immunity has been held to apply." *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007) (holding section 821.6 was inapplicable to alleged tortious conduct occurring during an arrest). The principal function of section 821.6 immunity is to provide relief from malicious prosecution." *Id.* Police conduct may be subject to section 821.6 immunity only if it is taken in the course or as a consequence of an investigation, such as an investigation into someone's guilt, not taken during the course of an arrest or seizure. *Id.*; *see also Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1118 (E.D. Cal. 2005) (holding Section 821.6 was inapplicable to conduct during a "buy/bust operation" because the officers were not conducting an investigation in preparation for judicial proceedings).

Ms. HWANG was never charged with a crime. Her damages are a consequence of the arrest and conduct of Defendants during the arrest and shortly after. Her damages are not based upon a subsequent investigation into her guilt or innocence. The conduct at issue clearly occurred during the arrest and seizure of Ms. HWANG. Defendants have no immunity under section 821.6 for any of Ms. HWANG's state law claims for the conduct alleged. Since the immunity does not apply, Defendant CITY is not immune from its respondeat superior liability.

E.    **MS. HWANG CAN TESTIFY ABOUT THE SEVERE, EXTREME EMOTIONAL DISTRESS SHE SUFFERED AS A RESULT OF THE SUBJECT INCIDENT ARREST, AND THERE IS NO BAR TO HER RECOVERY**

Defendants assert that Ms. HWANG cannot show that she suffered severe or extreme emotional distress, and also assert that Ms. HWANG cannot show that the subject-incident caused

her severe or extreme emotional distress. Although Defendants admit that the language used is "vile," they apparently consider it to be only isolated name calling. The language used against Ms. HWANG must be considered in the context of an officer yanking Ms. HWANG to the ground by pulling her hair when she had done nothing to provoke such misbehavior. Ms. HWANG testified that she suffered a panic attack after the arrest. On its face, this meets every element of Intentional Infliction of Emotional Distress.

There is no requirement that a psychologist or psychiatrist provide forensic evidence of causation where the issue does not require specialized training or education. The standard of the community as to what is outrageous conduct is within the jury's purview. No specialized training or education is necessary to reach the conclusion that a woman being yanked by the back of her hair, pulled to the ground, and being called a "cunt" by the same officer screaming in her face, is extreme, outrageous and intolerable conduct. A jury can determine the fact of whether such conduct caused Ms. HWANG severe and extreme emotional distress, such as that exhibited by the panic attack she suffered shortly afterward while in jail.

F.    **PLAINTIFF HAS A PROPER CAUSE OF ACTION FOR VIOLATION OF CIVIL CODE SECTION 51.7, WHICH ALSO PROHIBITS A VIOLATION BASED ON PLAINTIFF'S GENDER.**

The characteristics protected by Civil Code section 51.7 include those characteristics identified under Civil Code section 51(b). Section 51(b) states: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." "Sex" is defined as a person's gender, or gender related identity or gender related appearance. (Government Code section 12926 and Penal Code section 422.56). Here, the vile language used by Defendant Officer SERNA, who called Ms. HWANG a "cunt" on two occasions during the subject-incident use of force and arrest, is powerful evidence of a gender-based motivation for the misconduct. There is some evidence, from Mr. Flores, that Defendant Officer ARTIGA also

1  called Ms. HWANG a "cunt."  A trier of fact may determine whether one or both officers'

2  misconduct was motivated by Ms. HWANG's gender as a woman.

### G.    DEFENDANT'S MOTION WITH RESPECT TO SECTION 52.1 IS BASELESS AND SHOULD BE DENIED.

Defendant CITY has made the claim on several different occasions that Civil Code section 52.1

violations require threats, intimidation, and coercion that is somehow intended to violate a separate

right from the right violated by an officers' use of threats, intimidation, and coercion.  (See, for

example, *Maestrini v. City and County of San Franicsco, et al.*, U.S.D.C. Northern District California

Case No. 3:07-cv-02941 PJH, Defendants' Motion to Dismiss for Failure to State a Claim, Document

No. 10; and *Jones v. City and County of San Francisco, et al.*, U.S.D.C. Northern District California

Case No. 3:08-cv-00373 CW, Defendants' Motion to Dismiss for Failure to State a Claim, Document

No. 6).  Defendant CITY has not succeeded yet in cases Plaintiff's counsel is familiar with.

Plaintiff's counsel respectfully disagrees with Judge James' interpretation cited by Defendants.  The

clear language of section 52.1 is that the "threats, intimidation, or coercion" refers to the manner in

which the violation is committed.

To establish a claim under section 52.1, a plaintiff needs to establish that the defendants

"interfered with the plaintiffs' constitutional rights by the requisite threats, intimidation, or

coercion." *Austin v. Escondido Union Schl. Dist.*, 149 Cal. App. 4th 869, 882 (2007).  The

word "interferes" under this statute means "violates." *Id.* at 883.  "The essence of [this] claim is

that the defendant, by the specified improper means (*i.e.*, 'threats, intimidation or coercion'),

tried to or did prevent the plaintiff from doing something that he or she had the right to do under

the law or force the plaintiff to do something that he or she was not required to do under the

law." *Id.* Use of law enforcement authority to effectuate a seizure and a search can constitute

interference by "threats, interference, or coercion" if the police officer lacked a justification to

seize and search a person. *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387,

F. Supp. 2d 1084, 1102-1103 (N.D. Cal. 2005).  Jury instructions are not a substitute for statutory or

case law.

1    Here, Defendants' excessive force against and arrest of Ms. HWANG, and the outrageous,

2  intimidating use of an expletive and derogatory term, each satisfy all elements of section 52.1,

3  particularly when there was no justification to seize Ms. HWANG or to use force against her. This

4  motion must be denied.

5  **H.    AS NOTED HEREIN, GOVERNMENT CODE SECTION 821.6 DOES NOT**
6  **APPLY TO THE CIRCUMSTANCES OF THIS CASE, WHICH ARE**
    **DISTINCT FROM THE INVESTIGATIVE IMMUNITIES**
7  **CONTEMPLATED BY GOVERNMENT CODE SECTION 821.6.**

8      *Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007), held that section 821.6

9  was inapplicable to alleged tortious conduct occurring during an arrest, and stated: "The principal

10 function of section 821.6 immunity is to provide relief from malicious prosecution." *Id.* Police

11 conduct may be subject to section 821.6 immunity only if it is taken in the course or as a consequence

12 of an investigation, such as an investigation into someone's guilt, not taken during the course of an

13 arrest or seizure. *Id.*; *see also Phillips v. City of Fairfield*, 406 F. Supp. 2d 1101, 1118 (E.D. Cal.

14 2005) (holding Section 821.6 was inapplicable to conduct during a "buy/bust operation" because the

15 officers were not conducting an investigation in preparation for judicial proceedings).

16     There is no evidence that police were out at North Beach looking for Ms. HWANG to

17 investigate her. In this case, Ms. HWANG had the terrible misfortune that numerous other people

18 have also had of coming across Defendant Officer SERNA while out in North Beach at night.

19 SERNA was not investigating Ms. HWANG when this event occurred. Ms. HWANG was not

20 wanted for some other crime. This was a basic use of force and arrest, immediately arising out of

21 some interaction between Ms. HWANG and initially Defendant Officer SERNA.

22     Defendants remain liable for violation of section 52.1 for the false arrest and use of excessive

23 force against Ms. HWANG, which occurred through 'threats, intimidation and coercion" during the

24 course of the arrest.

25

26

27 **I.    THERE IS NOTHING GENERIC ABOUT DEFENDANT OFFICER SERNA'S**
    **HISTORY OF COMPLAINTS, AND THERE IS NO EVIDENCE THAT**
28 **DEFENDANT CITY TOOK ANY REMEDIAL ACTION. THE EVIDENCE**
    **ESTABLISHES THAT DEFENDANT CITY HAD BEEN WELL-AWARE OF A**

## KNOWN DANGER TO THE PUBLIC, YET LEFT THAT DANGER IN PLACE TO ATTACK MS. HWANG.

Plaintiff has identified ten prior lawsuits against Defendant Officer SERNA that all took place prior to the subject-incident involving Ms. HWANG. In addition, Magistrate Judge Larson has ordered disclosed 24 internal investigations into Defendant Officer SERNA. There is no evidence that Defendant Officer SERNA was ever disciplined, or that any steps whatsoever were taken by Defendant CITY to protect the public from the danger posed by Defendant Officer SERNA. Thus, a reasonable fact-finder may conclude that Defendant CITY had a policy or custom of authorizing or permitting abusive, explosive, excessive-force using, demeaning (telling Mr. Maestrini that he was crying like a little girl after SERNA beat him up, calling Mr. Alemozaffar a "girl", calling Ms. HWANG a "cunt," calling Mr. Myers a "monkey," calling Mrs. Myers an "ugly white woman," and on, and on, and on) behavior by its police officers, particularly Defendant Officer SERNA.

A plaintiff may prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded. See *Gillette v Delmore*, 979 F2d 1342, 1348 (9th Cir 1992); *Nadell v Las Vegas Metro Police Dept*, 268 F3d 924, 930 (9th Cir 2001) (finding no municipal liability because there was no evidence at trial establishing that the use of excessive force was a formal policy, that there was a widespread practice of the police department or that previous constitutional violations had occurred for which there was no reprimand or discharge); *Gomez v Vernon*, 255 F3d 1118, 1127 (9th Cir 2001) (holding that correctional department administrators may not take a "blind-eye" approach and that condoning unconstitutional acts by the failure to investigate or correct the repeated violations constitutes a policy or custom under *Monell*). The Ninth Circuit stated in *Henry v County of Shasta*, 132 F3d 512, 519 (9th Cir 1997), that when a municipality "turn[s] a blind eye to severe violations of inmates' constitutional rights — despite having received notice of such violations — a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference."

Defendant CITY cannot plausibly claim that it was unaware of the prior lawsuits filed against Defendant Officer SERNA (indeed, Mr. Connolly represented SERNA in several of those lawsuits). Nor can the City argue that they were unaware of the 24 internal investigations into Defendant

1  Officer SERNA that have been ordered disclosed in the *Oliver, Id.,* case concurrently pending
2  against Defendants CITY and SERNA in this Court. Indeed, Defendant Officer SERNA's
3  misconduct as described by Ms. HWANG is that of an officer who has, time and again, gotten away
4  with abusive conduct and remained undisciplined and unreprimanded, and in a position to continue
5  an established pattern of violation of people's rights, culminating in Ms. HWANG's injuries and
6  damages.

7       Among the prior examples of Defendant Officer SERNA's misconduct is the October 29,
8  2006, use of excessive force against Marco Maestrini. An O.C.C. complaint was filed in that case.
9  Mr. Maestrini suffered injuries to his head which bled onto his shirt, as documented in the
10 photographs attached to Exhibit I of the accompanying Declaration of Benjamin Nisenbaum.
11 Although photographs of Mr. Maestrini show injuries to several parts of his head, including the
12 crown of Mr. Maestrini's head, Defendant Officer SERNA documented his use of force and Mr.
13 Mestrini's injuries on page 4 of his narrative police report as: ""As we were doing so Maestrini
14 pulled away from my grip and was backing into the middle lanes of Broadway. I then grabbed
15 Maestrini by the front of his shirt and he fell onto the pavement. Once on the ground he was
16 handcuffed without further incident. Maestrini was taken to the Sheriffs bus to be processed. As I
17 was doing the paperwork I came back to the bus and saw that Maestrini was bleeding from a small
18 cut to the back of his head." In that case Defendant Officer SERNA also claimed that Mr. Maestrini
19 was intoxicated and could not care for himself. In fact, Mr. Maestrini was not intoxicated, and
20 suffered the head injuries as a result of Defendant Officer SERNA's use of force, causing injuries to
21 several different parts of Mr. Maestrini's head. It is inconceivable that Mr. Maestrini suffered the
22 depicted head injuries as a consequence of a single fall to the ground, particularly the injury to the
23 crown of Mr. Maestrini's head.

24      There is substantial evidence that Defendant CITY and Chief FONG turned a blind-eye to the
25 extensive history of complaints against Defendant Officer SERNA, with no evidence produced of
26 any investigation or discipline. There is only evidence that a blind eye was turned to Defendant
27 SERNA's pattern of abusive, illegal conduct.

28      **J. SHOULD MS. HWANG PREVAIL UPON HER CLAIMS, SHE IS ENTITLED TO
         AN AWARD OF PUNITIVE DAMAGES.**

In spite of the mass of evidence showing that Defendant Officers violated Plaintiff in an outrageous manner, Defendants assert that no jury could find such behavior malicious or oppressive. Drawing every reasonable inference in Ms. HWANG's favor, she was assaulted and battered, belittled and grotesquely demeaned (even the defendants admit that the language used, if true, is "vile"), falsely arrested based upon lies of at least the two Defendant Officers, and Defendant Officer SERNA himself has a long documented history of similar complaints of abuse and violations of civil rights. There is no better example of a case that, should Ms. HWANG prevail, warrants punitive damages awarded against the individual defendant officers.

## VI.    CONCLUSION

The Court should not adjudicate the heavily contested facts of this case. Defendants' Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,

Dated: August 20, 2008                    **The Law Offices of John L. Burris**

                                          /s/

                                          Ben Nisenbaum
                                          Attorney for Plaintiff