UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

ESTHER HWANG,

          Plaintiff,

  vs.                Case No. C07-02718 MMC

CITY AND COUNTY OF SAN FRANCISCO,
ET AL.,

          Defendants.

_____/

**CERTIFIED COPY**

Deposition of

ESTHER HWANG

Tuesday, April 15, 2008

REPORTED BY:  LESLIE CASTRO, CSR #8876

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

1

1                          I N D E X

2

3    Deposition of ESTHER HWANG

4    Tuesday, April 15, 2008

5

6                                                    Page

7    EXAMINATION BY MR. CONNOLLY                     5

8

9

10

11

12    Certified Questions:

13                    Page            Line

14

15

16

17

18

19

20

21

22

23

24

25

1                        E X H I B I T S

2

3   Deposition of ESTHER HWANG

4   Tuesday, April 15, 2008

5

6   Defendant's          Description              Page

7   A    Notice to Appear                         61

8   B    Photocopies of color photos              135

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT REMEMBERED THAT, pursuant to Notice, and on

2     Tuesday, April 15, 2008, commencing at the hour of

3     9:40 o'clock a.m. thereof, at the OFFICE OF THE CITY

4     ATTORNEY, Fox Plaza, Seventh Floor, 1390 Market Street,

5     San Francisco, California 94102, before me,

6     LESLIE CASTRO, a Certified Shorthand Reporter in and for

7     the State of California, personally appeared

8                    ESTHER HWANG

9     Called as a witness by the Defendant, who, being by me

10    first duly sworn, was thereupon examined and testified

11    as hereinafter set forth.

12

13    APPEARANCES:

14        LAW OFFICES OF JOHN L. BURRIS, 7677 Oakport Street,

15    Suite 1120, Oakland, California 94621, represented by

16    JOHN L. BURRIS and BENJAMIN NISENBAUM, Attorneys at Law,

17    appeared as counsel on behalf of the Plaintiff.

18

19        OFFICE OF THE CITY ATTORNEY, Fox Plaza, Sixth

20    Floor, 1390 Market Street, San Francisco, California

21    94102, represented by SEAN F. CONNOLLY, Deputy City

22    Attorney, appeared as counsel on behalf of the

23    Defendant.

24    Also Present:  Meredith Osborn, Deputy City Attorney

25                      ---oOo---

1                          ESTHER HWANG

2          being first duly sworn, testified as follows:

3

4    EXAMINATION BY MR. CONNOLLY:

5

6          MR. CONNOLLY:  Q  Ms. Hwang, I introduced myself

7    earlier.  My name is Sean Connolly.  I'm here with

8    Meredith Osborn who's also a city attorney in our

9    office.

10         A.    Okay.

11         MR. CONNOLLY:  The record should reflect that

12   Mr. Burris and Mr. Nisenbaum, your attorneys, are also

13   present.

14         Q.    You indicated just before we went on the

15   record that you'd never given a deposition before;

16   correct?

17         A.    That's correct.

18         Q.    What I'll do is I'll briefly explain, sort of,

19   what a deposition is and what the bigger road map will

20   be for today.

21              You have filed a lawsuit.  And it's a federal

22   lawsuit.  And as one of the devices that Federal rules

23   allow is for each party to take what we call discovery.

24   This is my opportunity to ask you about the case.  And

25   any relevant information that may come up or any

1       A.    Yes.

2       Q.    And it's safe to assume that car traffic could

3   pose a problem to someone jaywalking?

4       A.    Sure.

5       Q.    So Nathan called you back.  And I don't mean

6   to repeat what you said, but he said something to the

7   affect you would be jaywalking or something like that.

8             And grabbed your hand, I think, you said?

9       A.    No.  Actually, he was leading me.

10      Q.    What does that mean?  What do you mean by

11  that?

12      A.    He was holding my hand and leading me across

13  the street.  So I was following him.

14      Q.    So you'll have to explain that one to me.

15      A.    Okay.

16            That's what I was trying to explain earlier.

17  We walked out of the club.  We wanted to walk across the

18  street.  Nathan is leading me.  I'm not thinking "Oh,

19  we're jaywalking" -- we're not jaywalking.  We're just

20  going to cross the street.

21            But Nathan looks around just as he was about

22  to cross the street and he pulled me back with him and

23  he says "We shouldn't jaywalk."

24      Q.    So when you say he was leading you and holding

25  you by the hand, was he in front of you in the direction

1   you were going?  In other words, he was in front of you

2   walking toward -- off the sidewalk toward the street?

3        A.   Yes, like this (indicating).

4        Q.   Did he step into the street?

5        A.   Maybe like one foot off the curb.

6        Q.   Did you step into the street?

7        A.   No.

8        Q.   And when he changed his mind, did he change

9   his position around you or did he push you back toward

10  the sidewalk?

11       A.   Yes.

12       Q.   Which?

13       A.   He had my hand.  He stepped off, maybe off the

14  curb.  And then I was going in that direction too and he

15  just pulled me back (indicating).

16       Q.   My question is:  Did he change his position to

17  pull you back?  In other words, if he's leading you

18  going one direction, how does he pull you back the other

19  direction without changing his position?  Did he do that

20  or is there some other way that I'm just not aware of?

21       A.   I can show you.

22       THE WITNESS:  John, you want to be Nathan?

23       MR. BURRIS:  No.  Actually, I don't want to be

24  Nathan.  But I think you can explain it --

25       MR. CONNOLLY:  Q  Just try --

1        MR. BURRIS:  -- don't demonstrate.  Why don't

2   you --

3        THE WITNESS:  He's going across -- this is the

4   street, okay.  This is the curb.  He steps over the

5   curb.  I'm right behind him.  And then he goes "Oh, we

6   shouldn't jaywalk."  He pulls backwards and pulls me

7   back, too (indicating).

8        MR. CONNOLLY:  Q.  Then what happened?

9        A.   I said, "Oh, really."  I look up because I

10  wasn't even looking up.  I was just following my leader.

11       Q.   Why were you just following?

12       A.   I don't know.

13       Q.   Were you --

14       A.   I was just following.

15       Q.   Did you know where you were going at the time?

16       A.   Sure.  We were going across the street to see

17  Issac.

18       Q.   Okay.

19            So go ahead.  Sorry.

20       A.   Okay.

21            He looks around and he says "There's --

22  there's cops everywhere."

23            And I said, "Oh, yeah, they are."  You know.

24  "Yeah, there they are.  Okay, sure.  Probably not a good

25  idea?"

1    He said, "No."

2    So I saw a convenience market which is
3    right --

4    Q.    Are you repeating things that you said to him
5    or are you telling me things you think you may have said
6    to him?  In other words, do you recall saying to him
7    "Oh, you're right, it might not be a good idea"?

8    A.    I can't remember the exact words I said.  I
9    can't say what I said to him verbatim.  But I'm telling
10    you the gist of what I said to him.

11    Q.    It's important to me that you tell me
12    everything that you remember.  If you don't remember --

13    A.    Okay.

14    Q.    -- it, tell me it's a gist or a paraphrase.

15    A.    Okay.  That was a paraphrase.

16    Q.    Okay.  Go ahead.

17    A.    All of this is a paraphrase.  And if there is
18    something I do remember specifically, like, words,
19    gestures, then I will tell you.

20    Is that okay?

21    Q.    No, let's do it the other way around.

22    MR. BURRIS:  Hold on.

23    MR. CONNOLLY:  Q.  Just tell me what you remember.
24    If you don't remember --

25    A.    Okay.

1    Q.    -- tell me and I'll ask you to --

2    A.    But how can I remember --

3    MR. BURRIS:  Hold on.  You don't have to argue.

4  Just try to answer --

5    THE WITNESS:  Exactly.

6    MR. BURRIS:  -- his question.  You can answer it

7  exactly if you can.  If you cannot --

8    THE WITNESS:  Okay.  Tell.

9    MR. BURRIS:  -- then tell him.  Let him ask the

10  question first.

11    MR. CONNOLLY:  Q.  So what do you recall happening

12  at this point?  In other words, after he said, "Look at

13  all the police officers --

14    A.    Right.

15    Q.    You said, "Oh, yeah."  You acknowledged that.

16        Tell me what happened -- you recall happening

17  at that point?

18    A.    At that point I said something along the lines

19  of "Yes, you're right.  It's not a good idea to cross

20  the street."

21    Q.    Then?

22    A.    Then I look over and there is a convenience

23  market, liquor store type of place.  I said -- and I

24  said to Nathan "I want to go in there for a cigarette.

25  And Nathan is, like, "Okay."  So we walk over.

1    Q.   And how far away was that convenience liquor

2  store from where you were at that point?  Are we talking

3  about a couple of doors or --

4    A.   A couple of doors from Dolche.  It's -- it was

5  close enough for me to look right up and say "Okay,

6  that's where I want to go."

7         So there were three or four police officers in

8  front or near the vicinity of the convenience market and

9  that actually, now ironically, made me feel safe.

10        So I said to Nathan -- no, this happened

11  after.  No, I'm sorry.  Let me back up.

12        I went into the convenience store.  I bought a

13  pack of cigarettes.  I came out.  And then before I lit

14  up and I saw all the police officers around me, I felt

15  safe and I said to Nathan, "Let's just go home."

16        And he said, "That's a good idea."  And he

17  goes "I'll go get our coats from Dolche.  I'll be right

18  back."

19    Q.   So let me stop you there and ask a couple of

20  follow-up questions.

21    A.   Sure.

22    Q.   Did Nathan go with you into the store?

23    A.   No.

24    Q.   You went by yourself?

25    A.   Right.  Yes.

1      Q.   Do you recall how many clerks there were

2   inside of store?

3      A.   Yes.

4      Q.   And how many were there?

5      A.   One elderly gentleman.

6      Q.   And do you know his name, by any chance?

7      A.   No.

8      Q.   Had you seen him before?

9      A.   No.

10     Q.   Had you been to that store before?

11     A.   No.

12     Q.   The police officers you saw, did you recognize

13   any of them?

14     A.   No.

15     Q.   Had you seen any of them on previous occasions

16   that you remember?

17     A.   No.

18     Q.   Why -- if you know, why did Nathan decide to

19   say "Let's just go home?"  What changed in that brief

20   period of time that made you guys want to go home?

21     A.   I said that.

22     MR. BURRIS:  I don't think she said, it was Nathan

23   that said that.

24     THE WITNESS:  I said that.  I said, "Let's just go

25   home" and Nathan agreed.

1          MR. CONNOLLY:  Q.  Why did you decide that you just

2     wanted to go home?

3          A.    I was tired.

4          Q.    You weren't having a good time?

5          A.    I don't think it was a matter of having a good

6     time or not.  I was just tired.  It was a long week.

7          Q.    Okay.

8                Did anything else happen between being inside

9     Dolche and you deciding you'd rather go home, that maybe

10    would have made you decide that?

11         A.    No.

12         Q.    Did you discuss it with Nathan at any point in

13    time before you said that?

14         A.    No.

15         Q.    He said, "Okay"?

16         A.    Yes.

17         Q.    So you guys decided to shut it down for the

18    evening, get your coats and go home?

19         A.    Yes.

20         Q.    Now, I'm not -- I don't mean to repeat what

21    you said.

22                But I think you said that at that point he

23    went to get the coats?

24         A.    Yes.

25         Q.    Are you on the same sidewalk in front of

1    Dolche?

2        A.    We're on the same sidewalk, but not in front

3    of Dolche anymore.

4        Q.    Is Dolche on the same side of the street as

5    the liquor store?

6        A.    Yes.

7        Q.    Had you ever crossed the other side of the

8    street?

9        A.    That evening?

10       Q.    Yes, any point that you were talking to me

11   about?

12       A.    No.

13       Q.    You told him -- you said to him "Let's just go

14   home" after you bought the cigarettes?

15       A.    Yes.

16       Q.    And did you buy cigarettes?

17       A.    Yes.

18       Q.    And did you pay cash for that?

19       A.    Yes.

20       Q.    What happened -- did Nathan leave you to go

21   get the coats?

22       A.    Yes.

23       Q.    What happened at that point?

24       A.    Can I back up a little bit?

25       Q.    Sure.

1      A.    When -- the reason Nathan did not follow me

2  into the liquor store is because he was chitchatting

3  with those three officers right outside of the

4  convenience market liquor store, whatever you want to

5  call it.

6            And when he left me, I felt safe there because

7  he had been talking with these police officers.

8            So can you please repeat your question now.  I

9  just wanted to clarify that.

10     Q.    I said, "What happened after he went to get

11  the coats?

12     A.    I took one drag out of my cigarette.  And I

13  looked to my left and apart from those three officers

14  leaning up against the convenience store was another

15  officer.

16            He's very tall and he looked like he weighed

17  at least 200 pound.  And he stood apart from everyone

18  else.

19            And I was holding my cigarette and I looked up

20  at him and he was about three, four feet away from me to

21  my left.  And I smiled and I think I said, "Hello."

22            And he didn't say much.  I don't think he said

23  anything really.  And then I was just trying to strike

24  up, you know, small talk.  Just trying to be nice and

25  friendly.

1          And I said to him "I guess, you'd have to do
2    something to me if I tried to cross the street" as a
3    joke.  And I was smiling and being flirtatious.  And he
4    attacked me.

5        Q.   Let's stop there for a second.

6             Who did you later learn this officer to be?

7        A.   Later I learned that the tall, big fellow

8    was -- the officer who tackled me is Jesse Serna.

9        Q.   Okay.

10            So in this part, let me just go back and ask a
11    couple of questions.

12            You came out of the liquor store.  You lit a
13    cigarette, you were smoking a cigarette at some point
14    and you started -- you wanted to make a conversation
15    with this officer who you've identified as
16    Officer Serna?

17       A.   Yes.

18       Q.   And you said -- I think you said you were
19    three to four feet away from him at that time?

20       A.   Yes.  Three to four feet.

21       Q.   Were there any other officers in the vicinity
22    and if so, how close were they?

23       A.   There were other officers in the vicinity.
24    For sure there were at least three and they were behind
25    both myself and Officer Serna, maybe about -- just the

1    length of the sidewalk.  So no more than, like, I don't

2    know, six, seven feet.  And they were leaning up against

3    the wall in front of the convenience market.

4         Q.    Okay.

5               Now, help me out here, if you can.

6               Can you envision that part of Broadway?

7         A.    Yes.

8         Q.    That block of Broadway?

9         A.    Yes.

10        Q.    And do you know which direction is east?  In

11   other words, that part of Broadway that goes towards the

12   bay?

13        A.    Okay.

14        Q.    Right, the bay, the East Bay would be on the

15   other side of that?

16        A.    Right.

17        Q.    Do you -- and obviously the opposite direction

18   would be west, okay.  And also would be further down --

19        A.    Behind me.

20        Q.    -- behind you towards the center of the North

21   Beach?

22        A.    Okay.

23        Q.    Is the liquor store east of the club, if you

24   recall?  Do you recall where the liquor store is?

25        A.    The east is west of the club.

1        MR. BURRIS:  No.

2        MR. CONNOLLY:  Q.  What are you --

3        MR. BURRIS:  No.

4        MR. CONNOLLY:  Q  The liquor store -- do you know

5    whether or not the liquor store is east of the club or

6    not?

7        A.    I do know that the liquor store is towards the

8    west of the club.

9        Q.    So the liquor store is west of the club?

10        A.    Yes.

11        Q.    The reason I want to set it up is I want to

12    find out where you guys were in relation to the club and

13    the liquor store --

14        A.    Right.

15        Q.    -- when you were talking -- struck up a

16    conversation with Officer Serna.

17            Where were you?

18        A.    I was west of the club in front -- not quite

19    in front of the convenience market, but a little bit

20    over to the side.  I know when I went back there with

21    John, there was, like, a vacant spot.  I think it --

22    was it in between.  I don't remember.

23        Q.    That's okay if you don't remember.

24            So we're clear here:  The club is west of the

25    store, the liquor store?

1      A.   No.

2      MR. BURRIS:  No.  Hold on.

3      MR. CONNOLLY:  Q.  Isn't that what you said?

4      MR. BURRIS:  No.  That's not what she said.

5      MR. CONNOLLY:  Q.  Where is the club in relation to

6  the liquor store?

7      A.   The club is east and the liquor store is west.

8      Q.   Yes.  I'm sorry.  That's what I meant to say.

9  I said it backwards.  I understood you correctly.  I

10  just repeated it backwards.

11          And when you were talking to Serna --

12      A.   Yes.

13      Q.   -- I think you said that you were -- correct

14  me if I'm wrong -- west of the club, but slightly east

15  of the store.

16          Is that fair?

17      A.   Yes.

18      Q.   Okay.

19          I'm not going to get too much into this.

20  Obviously, I'm having a hard time.  I do generally

21  understand where you were.

22          Why did you strike up a conversation?

23      A.   He looked at me.  And he looked mean.  And I

24  was just trying to be nice and break the ice or

25  whatever.

```
 1        Q.    But why?

 2        A.    Why?

 3        Q.    Yes.

 4        A.    Because he was staring at me.

 5        Q.    But he looked mean, you said?

 6        A.    I know.  That's why I tried to be nice.

 7        Q.    So that made you want to talk to him?

 8        A.    I didn't want to talk to him.  I just, kind

 9   of, acknowledged him.

10        Q.    You're the one who started the conversation?

11        A.    Yes.

12        Q.    And you said you smiled at him?

13        A.    I did.

14        Q.    And you said you started being flirtatious?

15        A.    Smiling, flirtatious.  Yes.

16        Q.    You mean, in things you were saying or how you

17   were looking at him or both?

18        A.    Both, probably.

19        Q.    And your testimony is -- did he say anything

20   in response at that point?

21        A.    At that point -- you mean, right after what I

22   said?

23        Q.    Yes.

24        A.    Yes, he did.

25        Q.    What did he say?
```

1      A.   You're under arrest.  And then he attacked me.

2      Q.   For no reason?

3      A.   No reason.

4      Q.   Were you standing closer to the building line

5   on the sidewalk or were you standing closer to the

6   street?

7      A.   Standing closer to the street.  But not, like,

8   on the curb, you know.

9      Q.   And you had said something -- what did you say

10   to him again?  You --

11      A.   "I guess you'd have to do something to me if I

12   tried to cross the street."  Because I was looking at

13   all these people cross the street.

14      Q.   Why did you say that to him?

15      A.   Was that a question?  I'm sorry.

16      Q.   Yes.

17      A.   Why did I say that to him?  I don't know.  I

18   wish I didn't.

19      Q.   You wish you hadn't?

20      A.   I really wish I didn't say anything.

21           I felt compelled to talk to him because he was

22   staring at me.  And I've always been friendly with

23   San Francisco police --

24      Q.   So --

25      A.   -- officers, always.

1      Q.    Do you remember exactly what you said or is
2    that a the gist?

3      A.    That was the gist.  I'm paraphrasing.

4      Q.    It sounds like a dare.

5            Were you daring him?

6      A.    Oh, no.  No.

7      Q.    Were you testing him?  Were you trying to get
8    a rise out of him, trying to provoke him?  I'm still
9    trying to understand why you asked the question.  You
10   may not have regretted asking it, but why did you ask
11   him?

12     A.    I think I was just being funny.  Just making
13   conversation.

14           You have to understand -- I don't know if you
15   go out on Broadway past the time of 10:00 p.m.  But it's
16   crazy over there and people are constantly crossing the
17   street.  And I know it's against the law and Nathan
18   said, "We shouldn't do it."  That's fine.

19           But it was -- I was, like, you know, I'm
20   watching people literally cross the street as I'm saying
21   this.  So it was just, kind of, funny.  Like, not funny
22   I'm sure to him, but I was --

23     MR. BURRIS:  You don't know what was funny to him
24   or not.  I think you answered the question.

25     THE WITNESS:  Okay.  Thanks.

1       MR. CONNOLLY:  Q.  Did you make any motion that
2  would have suggested you were going to try to cross the
3  street?

4       A.   No.

5       Q.   Did you try to be funny and you stepped into
6  the street, one foot into the street?

7       A.   No.  That would be very disrespectful.  I
8  wouldn't do that to an officer.

9       Q.   Was it not disrespectful to, sort of, test him
10 or goad him by saying "You'd have to arrest me if I
11 did"?

12      A.   I didn't say "arrest."

13      Q.   I guess -- I think you said "Do something to
14 me."

15      MR. BURRIS:  That's not the same as arrest.

16      MR. CONNOLLY:  Q.  When you said "I guess you'd
17 have to do something to me if I tried to cross the
18 street," what did you envision the "do something" part
19 would have been?

20      A.   I think I was being flirtatious.

21      Q.   When you say "I guess you'd have to do
22 something to me," what did you understand that to mean
23 the "do something" part?  What were you asking him when
24 you said that?

25      A.   You mean, what was I expecting?  I don't

1    understand your question.

2        Q.    You're telling me that you didn't think he was
3    going to arrest you.

4        A.    No.

5        Q.    And I'm asking you -- and I said to you when
6    you asked him if he was going to arrest you if you
7    jaywalked. You said, "I didn't say that." And your
8    counsel objected. And I'm trying to find out --

9        MR. BURRIS:    You're misstating her testimony.

10       MR. CONNOLLY:    Q.    -- what did you mean?

11       A.    I didn't mean anything.

12       Q.    But you were essentially saying to him -- you
13   know, when you say "Officer, I guess, you'd have to do
14   something to me, you know, that -- if I jaywalk," what
15   you're saying to him is if I broke the law, you would
16   have to do your job, right? Is that the essence of what
17   you were saying?

18       A.    No.

19       Q.    Okay.

20             What was the essence of what you were saying?

21       A.    The essence of what I was saying was "Hey, how
22   are you? What do you think of these jaywalkers here?
23   They're just crossing the street left and right."

24       Q.    But you didn't say that, did you?

25       A.    No. So "I guess you'd have to do something to

1   me if I tried to cross the street." And I smiled. And,

2   you know what, his face actually softened before he

3   attacked me.

4        Q.   Was that a challenge?

5        A.   No. Of course not.

6        MR. BURRIS: You don't have to argue with him or

7   give any tone. It doesn't matter. Just answer the

8   question.

9        THE WITNESS: Okay.

10       MR. BURRIS: Okay.

11       THE WITNESS: No.

12       MR. CONNOLLY:   Q.   So you were not issuing a

13  challenge?

14       A.   No.

15       Q.   Let me ask you, do you recall exactly what you

16  said to him?

17       A.   No.

18       Q.   When you testified earlier under oath that you

19  said, "I guess you'd have to do something to me if I

20  tried to cross the street," is that the best you can

21  remember of what it was that you said to him?

22       A.   Yes.

23       Q.   Did you say anything else to him that was --

24  did you say anything else to him before you say he

25  grabbed you?

1       A.    No.

2       MR. BURRIS:    She didn't say grab.  She said

3   attacked.

4       MR. CONNOLLY:    I know.  I said, "Grabbed."

5       MR. BURRIS:    She didn't say that.

6       MR. CONNOLLY:    Q.  And you're clear that you didn't

7   make any physical motion toward the street?

8       A.    No.

9       MR. BURRIS:    Hold on.  That's a double negative.

10  So you have to make sure she's answering the question

11  being asked or you intend the question to be the way it

12  sounded.

13      MR. CONNOLLY:    No.  You need to make sure that your

14  client answers the question that was asked.

15      MR. BURRIS:    That question had a negative in it.

16      MR. CONNOLLY:    I know, I'll repeat it.  It must be

17  getting close to 3:30.

18      Can you repeat that last question?

19                  (Record read.)

20      MR. BURRIS:    That's the point I want to make.

21  That's a double negative.

22      THE WITNESS:    I see.

23      MR. CONNOLLY:    So I'll just ask it again.

24      Q.    I'll ask you one more time.

25      Did you make any motion to go to the street to

1  jaywalk?

2       A.    No.

3       Q.    Did you make any motion toward the officer?

4  In other words, maybe not towards the street but to

5  either brush by him, to push by him, to push him,

6  anything like that?

7       A.    No.

8       Q.    I took that word from your complaint.  That's

9  where I got that word, by the way.

10           At that point you testified that -- I don't

11  remember what you testified.  You said Officer Serna

12  attacked you.  And your complaint said Officer Serna

13  grabbed you.

14           But at that point that there's was some

15  physical contact -- by your testimony -- by

16  Officer Serna to touch you or seize you?

17       A.    Yes.

18       Q.    And your testimony is that other than

19  saying -- making small talk with him and being

20  flirtatious with him, that you did nothing else to cause

21  him to attack you?

22       A.    I did nothing else.

23       Q.    For no reason at all, he just decided, right

24  there, in the middle of Broadway, Friday night, with all

25  those people around crossing the street, he was going to

1  attack you?

2       MR. BURRIS:  You're asking her to speculate what's

3  in his head.  I object to the question.

4       MR. CONNOLLY:  I'm asking her --

5       MR. BURRIS:  As far as she knows.

6       MR. CONNOLLY:  Q.  Your testimony is you did

7  nothing other than what you said under those

8  circumstances that you described as a Saturday night on

9  Broadway, an area of town with lots of bars and

10 restaurants, and that you described earlier, other

11 people in the area crossing the street.

12      Your testimony is you did nothing else to cause him

13 to quote-unquote "attack you"?

14      A.   I did nothing else.

15      Q.   Okay.

16      What do you mean by "attack," what did he do?

17 Describe what Officer Serna did?

18      A.   He said, "You're under arrest."  And grabbed

19 my left hand, pulled it around so fast I cried out in

20 pain.  So I'm, kind of, like, down like this.

21      And then another officer comes behind me and I

22 didn't realize that he was there or what not.  I just

23 wanted to stop myself from falling because as

24 Officer Serna did that, he also grabbed my hair from

25 back here, he yanked it really hard and he screamed in

1    my face "You fucking cunt."  And later I realized he

2    said, "You stupid, fucking cunt" after that

3    (indicating).

4         Q.   So you've indicated here is that he grabbed

5    your left arm and you, sort of, acted it out -- of

6    course, the record doesn't pick it up.

7              But you appear to be bending forward --

8         A.   Yes.

9         Q.   -- is that accurate?

10        A.   Yes.

11        Q.   With your arm behind you?

12        A.   Yes.

13        Q.   You were still standing at that point?

14        A.   Yes.

15        Q.   And is there any way you can describe for the

16   record how far forward you were bent?  In other words --

17        A.   A good 45 degrees.  I mean --

18        Q.   Forty-five from straight up?

19        A.   Yes.  Here's 90.  Here's 45 (indicating).

20        Q.   Actually, I would think 90 is that way.

21        A.   Sorry.

22        Q.   Are you saying approximately 45 degrees from

23   straight up --

24        A.   Yes.

25        Q.   -- being the center line?

1           And then you said he grabbed your hair?

2      A.   Yes.

3      Q.   And are you sure it was him?

4      A.   Yes.

5      Q.   And how do you know it was him?

6      A.   Because he was the only one attacking me at

7  that time.

8      Q.   Okay.

9           Where were the other officers?  Did you say

10 they were behind you at that point --

11     A.   Later.

12     Q.   -- the way you were positioned with Serna?

13     A.   Later I find out Artiga came out from behind.

14     Q.   At this point in the transaction Serna grabbed

15 your hair?

16     A.   Right.

17     Q.   Where did he grab your hair?

18     A.   From back here.  Because remember I'm, kind

19 of, pulled forward.  So he grabbed it from the back

20 (indicating).

21     Q.   So you're, kind of, describing the base of the

22 back of your skull.  Maybe a little bit higher?

23     A.   Right there, yes (indicating).

24     MR. BURRIS:  Here --

25             (Interruption at the door.)

1       MR. CONNOLLY:  Q.  Can you describe -- for the

2  record, can you try to describe where he grabbed your

3  hair?

4       A.  At the base of my hair, right here

5  (indicating).

6       Q.  The base of your hairline underneath your

7  neck?

8       A.  Right here.  Like this (indicating).

9       Q.  I want you -- in other words, I want you to

10  articulate it.

11       A.  Base of my hairline, fist full of hair from

12  the neck hairline up (indicating).

13       Q.  Thanks.

14       And you said you cried out in pain?

15       A.  Yes.

16       Q.  And when he grabbed you by the hair in that

17  area you described, in the back of your head, did he

18  push you forward or pull you backwards or what did he --

19  in other words, which direction was the force going?

20       A.  Well, when he snapped my arm around me, I was

21  pulled forward and then when he grabbed my hair, I was

22  pulled backwards (indicating).

23       Q.  Then what happened -- hold on.  You said he

24  called you "A fucking bitch"?

25       A.  No.  Much, much worse.  Much, much, worse.  He

1    called me "You fucking cunt."

2         Q.    And you heard him say that?

3         A.    He screamed it in my face.

4         Q.    Is that a "yes"?

5         A.    Yes.

6         Q.    Did you see him or did you just hear it?

7         A.    I saw him.  I heard him.  Yes.

8         Q.    He was standing behind you?

9         A.    Serna?

10        Q.    At the time?

11        A.    He was standing right in front of me.

12        Q.    You'll have to explain that one to me.

13        A.    Okay.

14              When he whipped my arm around and I'm forward

15   like this, right -- then when he grabs my hair and

16   pulled me back, that's when I see his face and he's

17   screaming into my face "You fucking cunt" (indicating).

18        Q.    So let me see if I understand this.

19              Was he hanging from the side?  I don't

20   understand how he could be behind you holding your arm,

21   pushing you forward at the same time grab your hair

22   going backwards.  I would think it would be in front of

23   you.

24        A.    He wasn't in front.  I didn't say he was in

25   front of me.

1    Q.    He was looking over you?

2    A.    He was looking over me, yes.

3    Q.    And you were standing at the time?

4    A.    Kind of, sort of.  Probably in midair.

5    Q.    Okay.

6          And you said -- I think you said first he

7    called you -- you said, "You fucking cunt."  But then

8    you said later I learned he called me "You stupid

9    fucking cunt"?

10   A.    And then he said it again.

11   Q.    He said it twice?

12   A.    The first time was "You fucking cunt."  And

13   then when Artiga showed up, then he said, "You stupid,

14   fucking cunt."

15   Q.    Do you know why he said that?

16   A.    I don't know.

17   Q.    Did you say anything to him?

18   A.    I didn't say a word.

19   Q.    Did you resist?

20   A.    No.

21   Q.    You didn't struggle at all?

22   A.    No.

23   Q.    Were you surprised?

24   A.    Yes.

25   Q.    And you didn't react by pulling your arms away

1   or trying to turn away?

2       A.   I didn't have a chance to react.  This is a

3   200 pound guy attacking me.

4       Q.   So then what happened?

5       A.   I stepped backwards to keep myself from

6   falling.  And then later Artiga says I stepped on his

7   foot.

8       Q.   Well, let's separate what you did from what

9   you heard.  I just want --

10      A.   Okay.

11      Q.   -- want to know what you did; okay?

12      A.   Okay.

13           I stepped backwards.

14      Q.   You stepped backwards.

15           Can you describe the shoes you were wearing?

16      A.   They're Via Spiga's.  They're light -- they're

17  light tan and white.  And I just had bought them.

18      Q.   What kind of heel do they have?  Do they have

19  a spike heel?

20      A.   They have a spike heel.

21      Q.   Did you step on Artiga's foot?

22      A.   I don't know.

23      Q.   You don't know?

24      A.   I don't know.  I just stepped backwards.

25      Q.   Do you recall -- did you ever intentionally,

1   step on -- try to step on some officer's foot --

2        A.   No.

3        Q.   -- stomping more than once?

4        A.   No.

5        Q.   And when you stepped backwards, how close in

6   time was this to your description of what Serna did to

7   you?  Is it in the same motion, was it almost

8   immediately?

9        A.   Almost immediately.

10       Q.   And are you sure whose foot it was that you

11  stepped on?

12       A.   I didn't say I stepped on a foot.

13       Q.   Are you sure -- when you stepped back, was it

14  at that point in time?

15       MR. BURRIS:  What was what in what point in time?

16       MR. CONNOLLY:  Q.  After the thing you've described

17  Serna doing to you.

18       A.   I stepped backwards, and I told you earlier

19  that it was later I found out that Artiga said I stepped

20  on his foot.

21       MR. BURRIS:  That wasn't the question that was

22  asked of you.  It was in the sequence of stepping back.

23       THE WITNESS:  It was immediately after I stepped

24  backward.

25       MR. CONNOLLY:  Q.  It was immediately after?

1          A.    Right.  I was instinctively trying to keep
2    myself from falling.

3          Q.    And at that point in time, was Serna the only
4    one holding you?

5          A.    At that point in time, yes.

6          Q.    And after you stepped back, what happened?

7          A.    Someone comes -- oh, I'm pushed on the floor.

8          Q.    The ground?

9          A.    Yes, the cement.  And very hard because it
10   hurt my back.

11         Q.    Pushed from which direction?  From behind?

12         A.    Yes.  Like, just -- like, from the hair yank.
13   So he grabs my hair, I'm in, kind of, like, midair now
14   this way.  And so he yanks me down from my hair and I go
15   pap on my butt and my back on the cement floor
16   (indicating).

17         Q.    You mean, pulled down from behind, like --

18         A.    Hair yank.

19         Q.    Into a seated position on the ground?

20         A.    Almost like a laying down position on the
21   ground.

22         Q.    Did you end up on the ground?

23         A.    Oh, yes.

24         Q.    And what position were you in when you were on
25   the ground?

1      A.    Pretty much flat on my back.

2      Q.    And was your hair still being held?

3      A.    No.  He let go.

4      Q.    And was he -- is he Serna still?

5      A.    Yes.

6      Q.    And was anyone else involved at this point?

7      A.    Artiga.

8      Q.    And what did Artiga do?

9      A.    He immediately handcuffed me.

10     Q.    Once you were down?

11     A.    Right.

12     Q.    Had Artiga taken any role in taking you to the

13  ground?

14     A.    Not that I can recall, no.

15     Q.    And how did he handcuff you?  If you were on

16  your back, did he ask you to sit up, rollover, how did

17  that -- tell me how that happened.

18     A.    Pushed me back up.

19     Q.    Pushed you back up, meaning?

20     A.    Halfway backup, like, in a sitting position.

21  Just throwing me around, you know.  So I just -- back on

22  my butt, you know, with my knees up and, you know, he

23  puts the handcuff on me (indicating).

24     Q.    Are you sure it was him, Artiga?

25     A.    I'm pretty sure.

1          Q.   How would you describe him?  What was his

2    physical description that you recall?

3          A.   I guess, dark hair.  He's definitely shorter

4    and smaller than Serna.

5          Q.   Did you get to see him?  I mean, did you have

6    a chance to look at him?

7          A.   Yes.

8          Q.   Could you see his name tag or is this a name

9    that you learn the later was Artiga?

10         A.   I learned his name later.

11         Q.   And what happened next?

12         A.   He asked me --

13         Q.   "He" being?

14         A.   Artiga.  Sat right next to me and said, "I

15   know you."  And that's when I looked up at him and he

16   says "You used to live on Treasure Island."

17              And I said, "Yes, I did."

18              And then I'm in shock, I'm shaking.  And then

19   I hear Officer Serna, who's standing right above both of

20   us saying "Oh, now, you're trying to sugar talk us."

21         Q.   You're trying to what?

22         A.   "Sugar talk us.  Now, you're trying to sugar

23   talk us."

24         Q.   Serna said that?

25         A.   Yes.

1      A.    No longer on the bench.

2      Q.    You were being held in midair by your neck?

3      A.    Yes.

4      Q.    Okay.

5      A.    Yes.  Because I can't feel the floor or

6  anything.  And I had my eyes closed the entire time.

7      Q.    Your eyes were closed while you were in

8  midair?

9      A.    Yes.

10     Q.    So you didn't -- is the reason why you didn't

11  see who was holding you in midair by your neck was

12  because your eyes were closed?

13     A.    And the reason because I think this person was

14  doing it behind me.

15     Q.    Did it ever -- why didn't you open your eyes

16  to see?

17     A.    I was really out of it.  I was really out of

18  it.

19     Q.    Were you out of it because of the anxiety

20  episode or was it medication, was it alcohol, was it the

21  mixture of the alcohol and medication?  Do you have any

22  sense of why you were so out of it at this point?

23     A.    It's not the alcohol because I hardly drank

24  that night.

25     Q.    Was it the alcohol in combination with the

1    medication that you were on?

2         A.    No, no.  Definitely not.  It was -- now,

3    looking back, I think it was just the shock and a

4    massive anxiety attack.

5         Q.    But when you say you were out of it, meaning

6    you wouldn't open your eyes when someone had you by the

7    throat --

8         A.    Yes.

9         Q.    -- and you were dangling in midair?

10        A.    The thing is I felt like I can, kind of, feel

11   and see what's going on.  Not see, but feel, but I

12   couldn't react.

13        Q.    And what happened after you -- while you were

14   dangling in midair, while being held by the throat?

15        A.    Then -- this is where I felt sexually abused

16   or molested because that's when they decided to move me

17   to 850 Bryant.  Because now there are a lot more hands

18   on me, many more.  I can't even remember how many.

19              And someone was -- while they were moving me,

20   someone's hand was up my skirt and like grabbing my

21   butt, my left or right butt -- I don't know which one at

22   this point.  But it wasn't even like a press.  It was

23   like a hard grab.

24        Q.    So when did that happen?

25        A.    While they're transporting me from -- wherever

1  STATE OF CALIFORNIA                          )

2                                               )  Ss.

3  COUNTY OF CONTRA COSTA                       )

4

5          I hereby certify that the witness in the

6  foregoing deposition, named ESTHER HWANG, was by me duly

7  sworn to testify the truth, the whole truth, and nothing

8  but the truth in the within-entitled cause; that said

9  deposition was taken at the time and place therein

10 stated; that the testimony of said witness was reported

11 by me,

12                      LESLIE CASTRO,

13 A Certified Shorthand Reporter and disinterested person,

14 and was thereafter transcribed into typewriting; and

15 that the pertinent provisions of the applicable code or

16 rules of civil procedure relating to the notification of

17 the witness and counsel for the parties hereto of the

18 availability of the original transcript of deposition

19 for reading, correcting and signing have been complied

20 with.

21          And I further certify that I am not of

22 counsel or attorney for either or any of the parties to

23 said deposition, nor in any way interested in the

24 outcome of the cause named in said caption.

25          IN WITNESS WHEREOF, I have hereunto set

1    my hand and affixed my seal of office the 27th day of

2    April, 2008 .

3

4

5    _____

6                        LESLIE CASTRO
                         C.S.R. No. 8876
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25