UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

ESTHER HWANG,

        Plaintiff,

  vs.                  Case No. C07-02718 MMC

CITY AND COUNTY OF SAN FRANCISCO,
ET AL.,

        Defendants.

_____/

**CERTIFIED COPY**

Deposition of

MIRKO BUCHWALD

Tuesday, May 20, 2008

REPORTED BY:  LESLIE CASTRO, CSR #8876

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

1                              I N D E X

2

3    Deposition of MIRKO BUCHWALD

4    Tuesday, May 20, 2008

5

6                                                   Page

7    EXAMINATION BY MR. CONNOLLY                    5, 76

8    EXAMINATION BY MR. NISENBAUM                   73

9

10

11

12
     Certified Questions:
13
                       Page            Line
14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2

3    Deposition of MIRKO BUCHWALD

4    Tuesday, May 20, 2008

5

6    (No exhibits were offered.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       BE IT REMEMBERED THAT, pursuant to Notice, and on

2 Tuesday, May 20, 2008, commencing at the hour of

3 12:23 o'clock a.m. thereof, at the OFFICE OF THE CITY

4 ATTORNEY, Fox Plaza, Seventh Floor, 1390 Market

5 Street, San Francisco, California 94102, before me,

6 LESLIE CASTRO, a Certified Shorthand Reporter in and

7 for the State of California, personally appeared

8                  MIRKO BUCHWALD

9 Called as a witness by the Defendant, who, being by me

10 first duly sworn, was thereupon examined and testified

11 as hereinafter set forth.

12

13 APPEARANCES:

14      LAW OFFICES OF JOHN L. BURRIS, 7677 Oakport

15 Street, Suite 1120, Oakland, California 94621,

16 represented by BENJAMIN NISENBAUM, Attorneys at Law,

17 appeared as counsel on behalf of the Plaintiff.

18

19      OFFICE OF THE CITY ATTORNEY, Fox Plaza, Sixth

20 Floor, 1390 Market Street, San Francisco, California

21 94102, represented by SEAN F. CONNOLLY, Deputy City

22 Attorney, appeared as counsel on behalf of the

23 Defendant.

24 Also present:  Officer Jesse Serna

25                 ---oOo---

1          MIRKO BUCHWALD

2      being first duly sworn, testified as follows:

3

4  EXAMINATION BY MR. CONNOLLY:

5

6      MR. CONNOLLY:  Q  Mr. Buchwald, did I get it

7  right the first time?

8      A.    You did.

9      Q.    I've introduced myself.  My name is

10  Sean Connolly, I'm a deputy city attorney.  I represent

11  Officers Artiga and Serna and the City.

12          We're here at your deposition.  Present also

13  is Mr. Nisenbaum, co-counsel for the plaintiff

14  Esther Hwang and the court reporter.

15          I have briefly explained to you what a

16  deposition is and what your role in a deposition is.

17  And I understand you've been subpoenaed here -- I

18  subpoenaed you here for your deposition.

19          Although I told you a little bit about what a

20  deposition is, I'm going to on the record say the same

21  thing.  And I've basically explained that a deposition

22  is one of the tools available to the parties to conduct

23  discovery or an investigation as part of a lawsuit.

24          It's court sanctioned or court authorized.

25  The subpoena you received is a court order.  I've

1    have you been in the States?

2         A.    Since '89.  1989.  Eighteen years --

3    seventeen, eighteen years.

4         Q.    And what's your educational background?

5         A.    I have a degree from London City of Guilds,

6    art degree.

7         Q.    What's it called?

8         A.    London City of Guilds.

9         Q.    Spell that last part.

10        A.    City of Guilds, G-U-I-L-D-S.

11        Q.    What is that?

12        A.    It's an art school.

13        Q.    And what year did you obtain your degree?

14        A.    Two -- what 1990.

15        Q.    And are you employed, presently?

16        A.    Yes, I am.

17        Q.    Where?

18        A.    I'm self-employed.

19        Q.    What do you do?

20        A.    I teach martial arts.  I have a couple of

21    schools here in the City.

22        Q.    What form of martial arts do you teach?

23        A.    Well, I've got a background in a couple of

24    things.  The core of what I teach is called goju ryu

25    okinawan.

1    or State-wide.

2            Have you ever been taught in any environment

3    that -- any class in either a self-defense technique or

4    other physical combative technique that was taught by a

5    POST certified teacher or school?  Have you ever heard

6    of POST?

7        A.   No, I haven't.

8        Q.   Now, can you answer that question?  I think I

9    cut you off.

10           Have you ever been taught by a POST certified

11   teacher or school any technique?

12       A.   A POST certified teacher or school?  I'm not

13   familiar with what that is, so I wouldn't know whether I

14   had.  I'll say no.

15       Q.   I wouldn't expect it, but I'm just, kind of,

16   putting it out there.

17           And do you understand that the police officers

18   are trained in certain techniques of physical combat or

19   self-defense techniques or other arrest techniques?

20       A.   Yes, I am.

21       Q.   And what I'm asking you is based on whatever

22   your understanding is of that, have you ever been taught

23   by anyone or any person or any school that taught those

24   sorts of techniques that you are aware of?

25       A.   Possibly.

1     Q.   Can you identify what that is?

2     A.   Well, I've trained -- you know, over the years

3 of training, I've trained with lots of police officers.

4 You know, to be honest with you, it seems to me to have

5 a pretty basic -- the academy, whoever teaches them what

6 they go through when they first go through basic

7 training, it seems like it's a pretty limited

8 experience.

9     Q.   That's what I'm asking about.

10    A.   I've trained with several police officers, and

11 I've had police officers at my schools over the years.

12 But I can't say I've been taught by them, no.

13    Q.   So do you know who those police officers were,

14 do you recall who they were?

15    A.   Off the top of my head, no.

16    Q.   But these are persons who were police officers

17 who came to you for, sort of -- you taught them --

18    A.   Right.

19    Q.   -- things?

20    A.   Right.

21    Q.   And I'm assuming, you correct me if I'm wrong,

22 that you have gleaned from your experience in teaching

23 people like this that they too have been taught in a

24 certain type of training that's more basic and limited.

25        Are you familiar with what their training is?

1       A.   Not specifically.

2       Q.   So let's move ahead here.

3            We are obviously here to talk about

4    Esther Hwang.

5            Are you familiar with who Esther Hwang is?

6       A.   Yes, I am.

7       Q.   And who is she?

8       A.   She's the person involved in this case.

9       Q.   And do you know her?

10      A.   Yes, I do.

11      Q.   What is your relationship with her?

12      A.   We are casual friends.

13      Q.   And you have to pardon me, but what do you

14   mean by casual friends?  How would you describe it?

15      A.   Kind of just a loose association.  It's not

16   someone I really spend any time with or see.  But, you

17   know, I talk to her now and again.  I think she's taken

18   the classes at my school.  She took a kickboxing, the

19   fitness kickboxing classes at my school years ago.

20      Q.   How long would you say you've known her?

21      A.   I'm going to say maybe seven -- six or seven,

22   eight years maybe.

23      Q.   And again, these -- I'm going to ask you

24   questions -- if you remember, that's fine.  If you

25   don't --

1   was?

2      A.   You know, to be honest with you, I don't

3   really remember. I remember she came in "I have some

4   calendars." And maybe again I saw her somewhere else

5   maybe another time I think I saw her at another club.

6   It was a bar I was working at called Fluid. I think I

7   saw her once.

8      Q.   So you, kind of, got to know her through the

9   club scene?

10      A.   Right.

11      Q.   Pardon me for this next line of questions:

12   Has your relationship ever been anything more than

13   friends?

14      A.   No. No.

15      Q.   Has it ever been romantic?

16      A.   No.

17      Q.   Did you ever date her?

18      A.   No.

19      Q.   Did you ever have an isolated romantic moment

20   with her?

21      A.   No.

22      Q.   What is the -- when you saw her, when you had

23   contact with her, was it because you saw her or did

24   you -- would you call her up or would she call you up?

25   How did this friendship develop over the years?

1     A.    To be honest, I don't remember, specifically.

2  I think maybe she had my card, we would make -- we

3  talked at the front door and she was interested in

4  maybe -- I did martial arts, I taught and she was

5  interested in training.  And I think she lived by one of

6  my schools.  I think that's why she came into class.

7     Q.    Did she ever give you her phone number or her

8  cell phone?

9     A.    I would have thought so.

10     Q.    Is that a cell number that you would have in

11  your phone?

12     A.    I don't think so, no.

13     Q.    Does she have -- do you have her number?  Did

14  I ask you --

15     A.    I do.

16     Q.    -- the opposite does she have your number?

17     A.    Yes.  And I have her number, too.

18     Q.    And that's something you exchanged at some

19  point in the past?

20     A.    Right.  Right.

21     Q.    Would it be typical for you to talk to her on

22  the phone?

23     A.    No.

24     Q.    Did you ever socialize with her outside?  In

25  other words, outside the club scene.  You may have been

1    working a door one night and seen her.  But as far as
2    I'm concerned, you were working.
3        A.    Right.
4        Q.    Did you ever see her outside of work outside
5    of even your studio?
6        A.    I think we had dinner once.
7        Q.    Now, you mentioned that she did some work in
8    your studio?
9        A.    She trained, yeah.
10       Q.    How long ago was that?
11       A.    Maybe three, four years ago.  Maybe three
12   years ago.
13       Q.    And I think you said it was kickboxing?
14       A.    Right.  Fitness kickboxing classes.
15       Q.    What does that mean, fitness kickboxing?
16       A.    It's a basically a non-contact class.  It's
17   more geared to people who want to do more of a kind of
18   exercise than actual contact based training.
19       Q.    And how frequently did she do that or how many
20   times did she do that?
21       A.    I don't remember.  She came maybe -- I don't
22   know -- ten times, five times.
23       Q.    Okay.  When's the last time you spoke with
24   her -- Ms. Hwang?
25       A.    I spoke to her two weeks ago.

1      Q.   Did he give you any instructions on that?  Did

2  he tell you you could interview with her, could not,

3  should not?

4      A.   No, I don't remember.  I don't really remember

5  the conversation.

6      Q.   And did you talk to that woman?

7      A.   Yeah, I did.

8      Q.   Did you talk to other people?

9      A.   No.

10     Q.   In other words, did the press contact you?

11     A.   No.

12     Q.   The media?

13     A.   No.

14     Q.   Or any other investigators from any other

15  agencies?

16     A.   No.

17     Q.   Have you spoken to anyone in the last week or

18  so in preparation for this deposition?

19     A.   No.

20     Q.   And for the record, have you and I met before?

21     A.   No, we have not.

22     Q.   Have we ever spoken to each other before, as

23  far as you know?

24     A.   We have not.

25     Q.   Let's move to the night of the incident.

1          Do you recall generally that date?

2     A.   The date?  I do not.

3     Q.   Do you understand it to have been sometime in

4  May of last year, '07?

5     A.   Yes, I do.

6     Q.   And do you recall your working the door or

7  working in some capacity at Club Dolche that evening?

8     A.   Yes, I was.

9     Q.   At some point, as I understand it, you were

10 working and Ms. Hwang and her boyfriend came into the

11 club; is that right?

12    A.   That is correct.

13    Q.   Tell me -- why don't we start there.  Tell me

14 what you recall about that part of the incident.

15    A.   About them coming in?

16    Q.   Yes.  Just whatever you recollect.

17    A.   Okay.  I remember they came in, it was quite

18 early.  The club doesn't get usually busy until about

19 11:00, 11:00 o'clock-ish.  I know it was before that

20 because there was nobody really in the club.

21         I think she told me they had been out at

22 dinner and they came in.  And I don't know how long,

23 maybe an hour, half an hour.

24    Q.   Let me ask you a couple of follow-up

25 questions.

1    That evening, what were you working as?

2  A. I was working at the front door.

3  Q. And what were your duties at the front door?

4  A. Just like I said before, to, you know, control

5 the amount of people in there.

6  Q. And were there others working with you?

7  A. Yes, there were.

8  Q. How many?

9  A. Approximately, maybe two other guys at the

10 door.  Security, they were security.

11  Q. Do you recall their names?

12  A. No, I don't.

13  Q. Do they still work there?

14  A. I don't know.

15  Q. Can you describe them?

16  A. I worked directly for the club, the security

17 is outsourced is contracted by a company called Shore

18 Security.  And they have different guys there.  They

19 rotate different guys, some guys are there.

20  Q. Was it your understanding that these two other

21 security guards were employees of Shore Security that

22 were working the door that night?

23  A. They were.  And there was possibly more than

24 two at the front door.  Because what happens is the

25 security guards will, kind of, be outside, just kind of

1    hanging around outside until people start coming in and

2    then they post inside.  So I believe it was quite early

3    so there could have possibly been more at the front door

4    at the time.

5          Q.   So the club was not too busy at that point?

6          A.   No.

7          Q.   And tell me exactly -- I have to rely on you

8    to give me a picture of what you saw and what happened.

9               But when did you first see Ms. Hwang?  Were

10   you standing on the sidewalk when she walked up?  Were

11   you already inside the club and she walked up behind

12   you?  Did you happen to see her by accident?

13         A.   I don't remember exactly.

14         Q.   Do you know -- did you know her boyfriend?

15         A.   No.

16         Q.   Had you met him at any point before or after

17   that night?

18         A.   I don't know.

19         Q.   Do you recollect what he looks like?

20         A.   No.

21         Q.   Do you remember having a conversation with

22   her -- Ms. Hwang -- when she arrived at the club?

23         A.   Yes, I do.

24         Q.   And where did that take place?

25         A.   I don't remember exactly.  Probably outside.

1      Q.    Would you call it just small talk, a short

2  conversation or was it a long extended conversation?

3      A.    Small talk, small conversation.

4      Q.    Had she told you where she had been previously

5  when she had been out to dinner?

6      A.    I think she said she was celebrating

7  graduation, law school graduation.  And they were out to

8  dinner, if I remember correctly.

9      Q.    Did she appear to you as if she had been

10 drinking?

11     A.    No.

12     Q.    Could you smell alcohol on her?

13     A.    I wouldn't -- did I smell alcohol on her?  Did

14 I detect the smell of alcohol?

15     Q.    Yes.

16     A.    No.  No, I didn't.

17     Q.    So the record is clear:  You and I might know

18 what we're talking about here, but working in clubs, you

19 are used to detecting the smell of alcohol on people?

20     A.    Absolutely.

21     Q.    And generally speaking, the more someone

22 drinks, the stronger the odor of alcohol emanates from

23 them; is that fair in your experience?

24     A.    Yes.  The odor and the visual signs as well.

25     Q.    And having worked in the club scene as long as

1    you have, I'm sure you've seen, kind of learned on the

2    job so-to-speak, the certain symptoms of people who have

3    had a lot to drink?

4          A.    That's correct.

5          Q.    And by the way, I think I know the answer to

6    this, but I'll ask you anyway, is it safe to say that

7    you had not consumed any alcohol that night while

8    working?

9          A.    That's correct.  I don't drink.

10         Q.    Some people do, so I won't make the

11   assumption.

12         A.    No.

13         Q.    The conversation you had with her when she

14   walked in the club, that was short in nature.

15               Can you estimate how long it was?  Was it a

16   matter of seconds or minutes or --

17         A.    I don't remember.  I'm going to estimate a

18   minute.

19         Q.    And after that what happened?

20         A.    After that as far as?

21         Q.    Where did she go?  Where did you go?

22         A.    I was outside, you know.  She was inside.  I

23   think I walked through the club to the back once, and I

24   saw her sitting with her boyfriend by the dance floor.

25   And that was it, as far as inside.

1     Q.   Did you ever talk to her while she was inside?

2     A.   I don't think so. I might have said, "Hi" as

3  I walked through.

4     Q.   And did you see her drinking alcohol when you

5  were inside the club?

6     A.   I don't remember.

7     Q.   Did you authorize the bartender to buy her a

8  round or did you buy her a round --

9     A.   No.

10    Q.   -- as a courtesy?

11    A.   No.

12    Q.   And I think you said she was there

13  approximately an hour.

14           Did you ever have occasion to talk to her

15  again that evening?

16    A.   When she was coming out of the club, when she

17  was leaving.

18    Q.   And explain to me the circumstances.

19    A.   I -- I believe she asked me or he asked me if

20  they could leave their coats there in the coat check

21  because they were going across the street to another

22  place. And that was kind of the end of the conversation

23  when she came out of the club.

24    Q.   Did she talk to you directly about that or was

25  it her boyfriend?

1      A.   I think it was her, yeah.

2      Q.   And for the record, I'll represent to you the

3  person she was with was Nathan Flores.  So from time to

4  time, I may refer to her and Mr. Flores or Nathan.

5           Did you have a conversation with Mr. Flores at

6  any point while they were in or leaving the club?

7      A.   I don't know.  I don't think so.

8      Q.   Do you recall at any point in time either in

9  the club or leaving the club Ms. Hwang and Mr. Flores

10 having a verbal argument?

11     A.   No, I don't.

12     Q.   Did you detect any sort of problem or sort of

13 dissention between the two as they were leaving the

14 club?

15     A.   No.

16     Q.   And after this discussion about leaving the

17 coats, what happened?

18     A.   I believe they were -- they were about to walk

19 across the street.  They walked down about two --

20 there's a taqueria and there's, like, an old cafe bar

21 that's closed.  They walked down, outside the liquor

22 store and about to cross the street.  And they kind of

23 stood in the street right there.

24     Q.   Stop there for a minute, please.  I'm trying

25 to understand where this is happening.

1                    So Club Dolche is on Broadway; correct?

2        A.    That's correct.

3        Q.    And it's on the north side of the street

4    because Broadway runs east-west; is that correct?

5        A.    That is correct.

6        Q.    And if you're looking -- if you're standing at

7    the door of the Dolche with your back to the building

8    line facing Broadway, can you explain to me again where

9    Flores and Hwang went from that position so I can

10   understand it.

11       A.    I would say they were approximately 20 feet,

12   if I look to my right down the street.

13       Q.    That would be west?

14       A.    West -- no.  East.  East down the street

15   towards -- towards Columbus.

16       Q.    Isn't that west?

17       A.    Sorry.  Sorry.  Yeah.  Yeah.

18       Q.    They walked 20 feet west toward the liquor

19   store up the street?

20       A.    Yes, down the street.

21       Q.    West of Dolche --

22       A.    West of Dolche.

23       Q.    -- you said.

24             And they stood in the street?

25       A.    That's correct.  They looked like they were

1    about to try to cross the street.

2        Q.    When you say "it looked like they were about

3    to cross the street," you're referring, are you not, to

4    Broadway they were trying --

5        A.    Across the Broadway.

6        Q.    -- from the north side to the south side?

7        A.    That's correct.

8        Q.    And you saw them actually standing in the

9    street --

10       A.    I did, yeah.

11       Q.    -- as opposed to the sidewalk?

12       A.    That's correct.

13       Q.    And was there a crosswalk where they were

14   standing?

15       A.    No, there was not.

16       Q.    Were there cars parked there?

17       A.    There was no cars parked there.  There's no

18   cars parked on Broadway on Saturday nights.

19       Q.    And Broadway is a main thoroughfare through

20   North Beach; is it not?

21       A.    That is correct.

22       Q.    How long were they standing there in the

23   street on Broadway at that vantage point that you could

24   see them?

25            And let me take that back because that assumes

1    you were watching them, if you were watching them and

2    maybe you turned away after a certain amount of time.

3         A.    Right.

4         Q.    Do you recall -- you saw them standing in the

5    street?

6         A.    I saw them in the street.

7         Q.    How long did you see them standing in the

8    street?

9         A.    I don't remember.

10        Q.    I know this is hard.  I'll apologize once

11   again.  This is hard asking a lot of detailed

12   questions --

13        A.    Sure.

14        Q.    -- about an incident that's a year old.

15   Sometimes these things are five years old by the time we

16   ask these questions --

17        A.    Right.

18        Q.    -- so it can be really demanding on a witness.

19              Again, I'm just asking.  Some people remember

20   these things some people don't.  So you just give me --

21        A.    Is it better to give you an approximation

22   rather than saying I don't know?

23        Q.    If you have a basis to say it, yes.

24        A.    I'd rather say I don't know then to guess and

25   be completely wrong.

1      Q.   Only if you have a basis.  In other words, you

2   may not know.  It may have been less than thirty seconds

3   it may have been less than five minutes.  So you can say

4   I know it was less than five minutes.

5      A.   Okay.  I'll say it was less than a minute.

6      Q.   What happened after that?

7      A.   I believe Mr. Flores -- was that his name.

8      Q.   Yes.

9      A.   Came back into -- came back up to the front

10  door and asked if he could get their coats because they

11  were going to leave.  He came back into the club and was

12  inside.

13          At that point I noticed her walk off the

14  sidewalk back onto -- off the road back on the sidewalk

15  and was speaking to a police officer.

16     Q.   Okay.  So let me stop you there.

17          Up to that point had you seen either

18  Mr. Flores or Ms. Hwang talk to any police officers up

19  to that point?

20     A.   I don't remember.  I don't think so.

21     Q.   Did you see them have a verbal discussion or

22  argument at that point up to that point?

23     A.   With the police officer?

24     Q.   With each other.

25     A.   I don't remember that, no.

1        Q.    You just recall Mr. Flores coming back to get

2    the coats?

3        A.    That's correct.

4        Q.    And seeing Ms. Hwang walk which direction now?

5    West?

6        A.    Back onto the sidewalk on the west side.

7        Q.    On the -- on the north side?

8        A.    North side, yes.

9        Q.    And then she started talking to a police

10   officer?

11       A.    That's correct.

12       Q.    Do you recall who the police officer was?

13       A.    No, I don't.

14       Q.    Can you physically describe that police

15   officer?

16       A.    No, I can't.

17       Q.    Now, I want to digress for one moment here,

18   but before we continue on, seeing police officers on

19   Broadway on weekends, nights is a pretty normal

20   occurrence at least at that point in time?

21       A.    Absolutely.

22       Q.    And in your experience working the door, are

23   there a lot of police officers that patrol that area?

24       A.    Not now, but there was at that point.

25       Q.    So after -- let's go back to seeing Ms. Hwang

1   walk up to a police officer and you saw them talking

2   with each other?

3        A.    That's correct.

4        Q.    What else did you see at that point?

5        A.    I saw them talking briefly and then I

6   acting -- saw the police officer grab her arm and put it

7   behind her back.

8        Q.    Did you see her speaking to just one police

9   officer or was it more than one police officer?

10       A.    I think initially it was one, but I think

11  there was more -- there was more.

12       Q.    From the point in time that you saw her in the

13  street with Flores, at which point you said Flores came

14  back to get coats, from that point in time when she was

15  in the street to the point in time that she walked up to

16  the officer, did you lose sight of her?

17       A.    I don't think so.

18       Q.    And how much time elapsed between the point in

19  time whether she was in the street to that point in time

20  where you saw the officer grab her arm?

21       A.    Less than a minute.  I'll say less than a

22  minute, yeah.

23       Q.    Are you confident that you did not lose sight

24  of her in that period of time?  In other words, I'm

25  asking you to reaffirm that.  And if you're unsure, you

1    should let me know now.

2        A.    I'm not sure if I specifically saw every step

3    she took from the road back to the sidewalk.  But I

4    definitely saw her walk on the road, walk back up onto

5    the sidewalk and get grabbed by the police officer.

6        Q.    All right.  Now, did you just say police

7    officer or police officers?

8        A.    Officer.

9        Q.    And I asked you whether you recall it was one

10   police officer or more than this one, and I believe you

11   said there was only one that you recall?

12       A.    On Broadway, on Saturday night, there was

13   probably 20, 30 police officers.  There's a lot of

14   police on that street.  Outside the liquor store all

15   along there, there's police officers all along that

16   area.

17       Q.    Let me refine the question further.

18       A.    Sure.

19       Q.    She obviously must have got within close

20   proximity to that police officer that you referred to

21   that grabbed her arm?

22       A.    That's correct.

23       Q.    Probably within an arm's length, right, is

24   that a safe assumption?

25       A.    Within an arm's length.

1    Q.    Within a couple of feet of that officer, she

2   came within a couple of feet of that officer?

3    A.    She was there having a conversation, a normal

4   distance where someone was having a conversation.

5    Q.    Was there any officer within that normal

6   distance -- I'm using your word -- other than the

7   officer that grabbed her?

8         Because now you've said one officer grabbed

9   her arm, but there were a bunch of officers on Broadway.

10  I'm trying to get a sense were they all around her or

11  was there one here next to her, and the others were down

12  the street?

13   A.    There was one she was having a conversation

14  with, one police officer.  And I think, if my memory

15  severs me, there were other police officers within the

16  direct vicinity, maybe a few feet away.

17   Q.    But you saw one grab her arm?

18   A.    Right.

19   Q.    What did you see at that point?

20   A.    I saw them having a conversation.  And then I

21  saw her quite suddenly, her arm were pulled behind her

22  back (indicating).

23   Q.    And one arm?

24   A.    Yes, if I remember.

25   Q.    I'm sorry?

1      A.   If I remember correctly, yeah.

2      Q.   Do you recall which arm?

3      A.   Well, if she was to my right, I think it was

4   her left arm (indicating).

5      Q.   And what happened after that?

6      A.   I saw her left arm get grabbed behind her

7   back, and I think the next thing I remember seeing was

8   her sat on the ground.

9      Q.   Are you saying that she -- when she was -- are

10  you saying she sat on the ground?

11     A.   No.  I think she is put on the ground.  I

12  think she was handcuffed and put on the ground.

13     Q.   She was led to the ground, sort of?

14     A.   I didn't actually see that.  I think my first

15  instinct at the time was exactly this situation, I

16  thought "Oh, no, this isn't going to be good."

17          So my first initial reaction was to not want

18  to get involved, not go down there, not even, kind of,

19  look at what was going on.  But I definitely saw --

20  because initially I was watching.

21          I saw her arm get yanked behind her back.  I

22  don't remember if I -- how she got led to the ground

23  because she got put on the floor.  You know, I remember

24  her being sat on the ground for quite an amount of time.

25     Q.   Fair enough.

1           When she was sat on the ground, do you recall
2     her being handcuffed or someone handcuffed her?
3           A.    I believe she was handcuffed behind her back.
4           Q.    And starting from when you saw her seated on
5     the ground, what happened after that?
6           A.    She was -- she was on the ground for quite
7     some time.  I'd say approximately ten minutes maybe.
8     And I believe she was put in the back of the police car,
9     police van.
10          Q.    Did you watch her the entire time?
11          A.    Most of it, yeah.
12          Q.    In the approximate ten minutes that you saw
13    her on the ground before she was led to a police van --
14    is that what you said?
15          A.    Right, I think so.
16          Q.    Was she just seated there by herself?
17          A.    Yeah.  There were other police officers around
18    there.
19          Q.    Was she talking to anyone?
20          A.    I don't think so.
21          Q.    Did you hear her yelling or screaming at
22    anyone?
23          A.    I was out of distance to hear anything.
24          Q.    What was your distance from her at that point?
25          A.    Approximately, maybe 25, 30 feet.

1     Q.    And was your view of her unobstructed and

2   unimpeded?

3     A.    It was unobstructed, yeah.

4     Q.    At any point did passer-bys or police officers

5   walk between you and her from that distance and obstruct

6   your view or did you have a --

7     A.    It was quite early on Broadway, it tends to be

8   quieter, somebody might have walked past.  But as I

9   recall, I had a pretty clear view of what was going on.

10    Q.    So you could see her pretty well for most of

11  the time?

12    A.    Right.

13    Q.    I'm assuming you were watching because you

14  were curious what was going on, it someone you knew?

15    A.    Right.

16    Q.    During that ten minutes, was there anything --

17  was there anything that happened that was, you know, of

18  significance?

19    A.    I remember her top came down because the guys

20  at the door were laughing because her breasts were

21  exposed.

22    Q.    The guys, now who are you referring to?

23    A.    The security guys I was working with.

24    Q.    The security guys?

25    A.    Right.

1      Q.   Explain to me what you mean when you say her

2 top came down.

3      A.   I think she had, kind of, cocktail dress on,

4 it came down here.  And I guess when she got put on the

5 ground or handcuffed, it came down.

6      Q.   How far did it come down?

7      A.   Past her nipples.

8      Q.   And you could see that?

9      A.   Yes.

10      Q.   And how long was it in that position?

11      A.   I don't remember.  I didn't really want to

12 look, to be honest with you.

13      Q.   But did you look away or did you continue

14 looking?

15      A.   I think I looked away at that point.

16      Q.   And did someone lift her -- I've been calling

17 it a halter top, did someone lift the top?

18      A.   I think possibly, yeah.

19      Q.   Do you recall who?

20      A.   No.

21      Q.   Was it ever -- did you ever see it

22 repositioned again later?

23      A.   I don't remember that.

24      Q.   In that period of time when you were looking

25 at her, from approximately 30 feet, in that ten-minute

1   period of time, did you see any police officer strike
2   her with a fist?

3       A.   No, I didn't.

4       Q.   Did you ever see any police officer strike her
5   with an open hand?

6       A.   No, I didn't.

7       Q.   Did you see any police officer kick her?

8       A.   No, I didn't.

9       Q.   Did you see any police officer draw a weapon
10  and point it at her?

11      A.   No, I did not.

12      Q.   Did you hear any police officer say anything
13  to her?

14      A.   No, I didn't hear any conversation.

15      Q.   Could you hear any sounds at all from police
16  officers?

17      A.   I heard no sounds.

18      Q.   Were there sounds or you could hear no sounds?

19      A.   I couldn't hear anything.

20      Q.   Would you have been able to hear voices at
21  that distance?  In other words, you may not have been
22  able to make out what was being said, but you could you
23  have heard voices?

24      A.   No.

25      Q.   Because you're still too --

1      A.    I'm at the front door of a club where there's

2  music coming out of the club as well.

3      Q.    Did you see any police officer do anything of

4  a physical nature to her while she was on the ground

5  handcuffed?

6      A.    No, I didn't.

7      Q.    And when you say she was seated on the ground,

8  this is on the sidewalk?

9      A.    Yeah, in the middle of the sidewalk.

10     Q.    In the middle of the sidewalk?

11     A.    Right.

12     Q.    And is this near the liquor store?

13     A.    I believe it was outside the liquor store.

14     Q.    Did you ever see her go inside the liquor

15  store at any point?

16     A.    I don't remember.  I don't think so.

17     Q.    You don't remember that?

18     A.    I would like to add something, though, because

19  you, kind of, skipped past it, and that's the way she

20  was, kind of, grabbed.

21     Q.    Which part are we talking about?

22     A.    When the police officers grabbed her arm

23  behind her back.  Because, you know --

24     Q.    I'll ask you some questions.  Tell me what you

25  saw and I'll ask follow-up to it.

1        Just describe what you saw and then we'll talk
2    about it.
3        A.    I saw a pretty sudden -- a pretty sudden and
4    pretty sharp grabbing and yanking of her arm behind her
5    back. You know, I come from experience, you know
6    teaching, these sort of techniques. And in my -- in my
7    schools when we teach these sort of things, it's done
8    very gradually. Because if you grab somebody's arm and
9    are very forceful like that it can put a lot of pressure
10   on the joints and arm. So we teach them slowly.
11       I'll give you an example, let me use your arm.
12       MR. NISENBAUM:  Slowly.
13       THE WITNESS:  If I hold his arm like this, for
14   example, I'm just going to restrain it. I want to hold
15   him like this. And if I just hold his arm here like
16   this, that's fine. But if start to lift up on the
17   joint, instantly he's got a lot of (indicating) --
18       MR. CONNOLLY:  Q  Slow down.
19       A.    -- pain.
20       Q.    Slow down?
21       A.    If I grab him like this and do it fast, he's
22   going to be in a lot of pain. So the way he's
23   grabbed (indicating) --
24       MR. NISENBAUM:  Just so you know --
25       THE WITNESS:  The way was fast, it was like that.

1    It was behind her back (indicating).

2         MR. NISENBAUM:  Let me show you this, it's a

3    surgically repaired shoulder and it remains fine.

4         THE WITNESS:  So I was a bit shocked that it was

5    done so --

6         MR. CONNOLLY:  Q  I think you --

7         A.    So hard.

8         Q.    Let me ask you about that:  You said while you

9    saw her after that point on the ground ten minutes later

10   you didn't hear her say anything?

11        A.    No, I was out of range.

12        Q.    So you didn't hear her call in pain or yelling

13   out for medical aid or anything of that sort; correct?

14        A.    No.

15        Q.    Is that correct?

16        A.    That's correct.

17        Q.    And you didn't see her squirming or recoiling

18   or doing something physically that would indicate that

19   her shoulder or her elbow were in pain did you?

20        A.    I did not, no.  She looked for distressed,

21   though.

22        Q.    I can understand.  She was arrested in the

23   middle of Broadway Street.  I only want to know what you

24   saw.  And believe me, she has testified to her own

25   experience there.  So a lot of that we've covered.  I do

1    want to ask you a little bit about this -- I'm using

2    your words -- this sudden sharp motion to get her arm

3    behind her back.

4         A.   Right.

5         Q.   And I don't pretend to be an expert in these

6    sort of things?

7         A.   Right.

8         Q.   But I do know from my own scraps that any time

9    you have a physical opponent that poses a threat in any

10   capacity, that you don't want to give away advantage by

11   doing something that is slow and gradual.

12        A.   But don't they want to pose a throat?

13        Q.   Isn't the best way to gain advantage is to do

14   a technique or a device quickly before the opponent can

15   react?

16        A.   That is if they pose a threat.  For me, for

17   example, working in security thing over the years,

18   there's been a lot of situations you have to apply the

19   right amount of pressure based on that situation.

20             It's like if I have a student that comes into

21   school to train and I spar with that student, we train

22   together, when they first start I go nice and easy, and

23   I help them develop.  I don't go all out right off the

24   bat.

25        Q.   With all due respect --

1          A.    I'm just giving --

2          Q.    -- the main streets --

3          A.    -- example of force --

4          Q.    -- criminal --

5          A.    -- force when it's political, when it's

6     appropriate, right.

7          Q.    But you understand that maybe police officers

8     are trained differently?

9          A.    Right.

10         Q.    And they have to patrol in the real world?

11         A.    Right.

12         Q.    And they don't have the luxury of a studio --

13         A.    Right.

14         Q.    -- to test devices?

15         A.    That was just an example.

16         Q.    Right.  We might as use this occasion to try

17    to help each other understand what we're talking about

18    here because I don't mind talking about this.

19         A.    Right.

20         Q.    But for police officers, they never know who

21    they're dealing with --

22         A.    Right.

23         Q.    -- whether that person was trained in martial

24    arts or is a physical threat for some other reason?

25         A.    Right.

1    Q.   -- is bigger and faster and more dangerous.

2    Or has a motive to hurt the police officer, like a

3    warrant, they don't want to go back to jail.  Or maybe

4    they're armed with a knife or a gun or some other

5    weapon.  Or they're dealing with drunks who I think you

6    might agree tend to get a lot of bravado and are more

7    willing to, sort of, challenge authority and test

8    limits.  You ever know who you're dealing with.  Even

9    you never know --

10    A.   Right.

11    Q.   -- who you're dealing with when you're working

12    the door.

13         Is it possible police officers are trained

14    differently than how you train in your studio, in your

15    environment?

16    A.   Absolutely.  But I think a lot of the

17    situations where it deals with drunk people are very

18    similar.  You know, many -- my 15 years of working the

19    door when I see someone that's in a cocktail dress and

20    heels, I don't feel threatened against someone who's in

21    a 3XL T-shirt and baggie pants.

22    Q.   Let me ask you this:  Did you see Ms. Hwang

23    kick a police officer?

24    A.   Who's Ms. Hwang?

25    Q.   Esther.

1     A.   Oh.  Oh.

2     Q.   Wang or Hwang, I think she pronounce it Hwang.

3     A.   Okay.

4     Q.   Did you see her kick a police officer moments

5 before or some period of time before she was grabbed?

6     A.   I did not.

7     Q.   If she had, would that change your opinion of

8 whether or not she posed a threat in a --

9     A.   Yes, it would.

10     Q.   Would it surprise you to learn that she

11 admitted to stomping on a police officer?

12     A.   I didn't see --

13     MR. NISENBAUM:  I object that that misstates the

14 evidence and misstates the testimony.

15     THE WITNESS:  Right.

16     MR. CONNOLLY:  Q  So my point here is I want

17 you to understand -- I just -- I appreciate what

18 you're telling me --

19     A.   Right.  Right.

20     Q.   -- but I don't want you to engage in

21 assumptions --

22     A.   Right.

23     Q.   -- about police officer's conduct.

24     A.   Right.

25     Q.   If there are other things that maybe you

1   weren't privy to or aware of -- but it's important that

2   I get your perspective --

3        A.   Right.

4        Q.   -- I have no problem with you bringing it to

5   my attention --

6        A.   Right.

7        Q.   -- because that's what this process is about.

8             And you probably are also aware that

9   everyone's perception of things --

10       A.   Right.

11       Q.   -- of the same incident is different.  And

12  we're learning that here in this case.  But that's not

13  for me to say here.

14            So I appreciate what you're telling me --

15       A.   Right.

16       Q.   -- and I want you -- and that's why I'm asking

17  you about sort of the basis for your perceptions and

18  maybe some of the assumptions that you have.

19            Do you understand that?

20       A.   I do.

21       Q.   Let's see.  You saw -- so I asked you about

22  whether you saw any police officer do any things to her:

23  Kick her, punch her, et cetera, et cetera.  I went

24  through this litany of things.

25       A.   That's right.

1    Q.  And you said, "no."

2    A.  Right.

3    Q.  And you pointed out you wanted to talk about

4 the suddenness and sharpness of the grabbing of her arm.

5    Did you see anything else happen that is of

6 any significance that I should know about?

7    A.  No.

8    Q.  Did you see her put into the van?

9    A.  Yes, I did.

10    Q.  And was that non-consequential, she was just

11 put in the van like any other person may have been?  In

12 other words --

13    A.  Yeah.

14    Q.  -- thrown into the van or roughed up or

15 anything like that?

16    A.  No, I didn't.

17    Q.  Did you see Nathan Flores walk up to her and

18 talk to her shortly before she was put into the van?

19    A.  I don't remember.

20    Q.  Do you recall him or anyone else exchanging

21 property with her jewelry, coats, et cetera, et cetera,

22 did you see anything like that happening?

23    A.  I don't remember that.

24    Q.  Can you -- I think I asked you this:  Can you

25 give a physical description of the officer or officers

1   that you saw --

2        A.   No.

3        Q.   -- dealing with Hwang?

4             When I say "dealing with," arresting her --

5        A.   No.

6        Q.   -- or putting her arm behind her back?

7             Do you know Officer Serna to my right?

8        A.   No.

9        Q.   Do you know Officer Nelson Artiga?

10       A.   No.

11       Q.   Have you seen either this officer to my right

12  or someone else named Artiga who was at the scene, that

13  you recall?

14       A.   Not that I recall.  I possibly have seen them

15  working on Broadway if they're working on Broadway, but

16  no.

17       Q.   I think I'm just about done.

18            Is there anything else that I haven't asked

19  either by accident or oversight that you think is

20  important?

21       A.   No, I think that's it.

22       Q.   But we've covered a lot.

23       A.   No, I think that's it.

24  MR. CONNOLLY:  I'm done.

25            Mr. Nisenbaum may or may not have questions

1   for you.

2          MR. NISENBAUM:  I do have a few.

3          THE WITNESS:  Okay.

4   EXAMINATION BY MR. NISENBAUM:

5          MR. NISENBAUM:  Q  When you saw Ms. Hwang,

6   Esther Hwang leaving Dolche on the night of the

7   incident, what was her demeanor?

8          A.   She seemed fine, you know.

9          Q.   Did she appear to be more -- did she appear to

10  be intoxicated when she left Dolche?

11         A.   She could have been drinking, but you know,

12  she didn't appear to me in my opinion to be intoxicated

13  or drunk.

14         Q.   When she left Dolche, do you recall smelling

15  the odor of alcohol emanating from her?

16         A.   I do not, no.

17         Q.   Now, you mentioned that you're somewhat

18  reluctant to be here testifying?

19         A.   Right.

20         Q.   Why is that?

21         A.   I have a busy schedule, I run two schools.

22         Q.   When -- I'll be through with this pretty

23  quick.

24              You said that you saw Ms. Hwang and Mr. Flores

25  or a person represented to be Mr. Flores in the street

1    on Broadway at some point.

2            About how far from the sidewalk were they?

3        A.    I would approximate seven feet -- maybe six,

4    seven, eight feet.

5        Q.    And you said there were no cars parked on

6    Broadway at night?

7        A.    No, there's no cars allowed to park there

8    after 8:00 o'clock.

9        Q.    And that was true this night as well?

10       A.    Yes.

11       Q.    And were there, in fact, no cars parked on

12   Broadway?

13       A.    There's no parking there, it's tow away.

14       Q.    Are cars able to drive down Broadway?

15       A.    Yes, they are.

16       Q.    Do you know whether or not when you saw them

17   in the street whether they were blocking traffic?

18       A.    No, they weren't blocking traffic.

19       Q.    Okay.  Prior to seeing the officer quickly

20   grab Ms. Hwang's arm as you've described, were you able

21   to tell what Ms. Hwang's demeanor appeared to be?

22       A.    It looked to me like they were just having a

23   conversation.  That's why I was kind of shocked that she

24   got her arms yanked behind her back.

25       Q.    Did she appear to be acting aggressively

1    towards the officer?

2        A.    No.

3        Q.    And at that point, were you able to --

4        A.    No.

5        Q.    -- hear anything Ms. Hwang said right before

6    the arm situation?

7        A.    No, I didn't hear anything.

8        Q.    Did she appear to be yelling at the officer?

9        A.    No.

10       Q.    Before in the moments preceding when the

11   officer grabbed Ms. Hwang by the arm, did you notice

12   whether Ms. Hwang made any sudden movement toward the

13   officer?

14       A.    No, she did not, from what I saw or remember.

15       Q.    At any point in time, did you see an officer

16   pull Ms. Hwang's hair?

17       A.    I did not.  I don't remember.

18       Q.    Now, you mentioned that some of the security

19   people at the door were laughing about Ms. Hwang's top

20   coming down?

21       A.    Right.  That's right.

22       Q.    Do you know what the demeanor of officers

23   around Ms. Hwang was?

24       A.    I don't know.

25       Q.    At the time the officer grabbed Ms. Hwang, was

1    she in the street?

2           A.    No, she was on the sidewalk.

3           Q.    And do you know about how far into the

4    sidewalk she was?

5           A.    Three -- two feet, three feet.

6           Q.    Do you know if Ms. Hwang had a purse with her?

7           A.    I don't remember that.

8           Q.    Do you know if Ms. Hwang had anything in her

9    hands?

10          A.    I don't remember that.  I don't know.

11          Q.    Did you ever see Ms. Hwang put -- lift a hand

12   towards the officer?

13          A.    I don't remember.

14          MR. NISENBAUM:  Thank-you that's all I have.

15          MR. CONNOLLY:  Quick follow up on two of the things

16   he brought up.

17   FURTHER EXAMINATION BY MR. CONNOLLY:

18          Q.    When you saw Ms. Hwang handcuffed, did you see

19   her attempt to pull away while she was being handcuffed

20   or curl away or move away?

21          A.    I don't know.  I don't remember.

22          Q.    And when she left the club with Mr. Flores,

23   did you actually see her leaving the club?

24          A.    Yeah.

25          Q.    Did you --

1        A.    I was outside.

2        Q.    -- did you have a conversation with her?

3        A.    Yes, I did.

4        Q.    Was that a long conversation or a short

5    conversation?

6        A.    No.  I think she asked me if they could leave

7    their coats there.

8        Q.    I remember you said that.

9              How long did that last, a couple of seconds?

10       A.    Right.

11       Q.    That just lasted a couple of seconds?

12       A.    Right.

13       Q.    Excuse me one second.

14             And Mr. Nisenbaum asked you this and I'm going

15   to ask you again, did you see her hair pulled?

16       A.    No -- I didn't see that or I don't remember

17   seeing that.  I don't think so because that would have

18   stuck in my mind.

19       MR. CONNOLLY:  Fair enough.  I'm done.  Thank you

20   very much.  Thanks for your time.

21       COURT REPORTER:  For the record, who would like a

22   copy?

23       MR. NISENBAUM:  Yes.

24       (Whereupon, the deposition adjourned.

25       At 1:51 p.m.)

1
2
3
MIRKO BUCHWALD
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF CALIFORNIA                          )

2                                               )   Ss.

3  COUNTY OF CONTRA COSTA                        )

4

5          I hereby certify that the witness in the

6  foregoing deposition, named MIRKO BUCHWALD, was by me

7  duly sworn to testify the truth, the whole truth, and

8  nothing but the truth in the within-entitled cause;

9  that said deposition was taken at the time and place

10  therein stated; that the testimony of said witness was

11  reported by me,

12                      LESLIE CASTRO,

13  A Certified Shorthand Reporter and disinterested

14  person, and was thereafter transcribed into

15  typewriting; and that the pertinent provisions of the

16  applicable code or rules of civil procedure relating

17  to the notification of the witness and counsel for the

18  parties hereto of the availability of the original

19  transcript of deposition for reading, correcting and

20  signing have been complied with.

21          And I further certify that I am not of

22  counsel or attorney for either or any of the parties

23  to said deposition, nor in any way interested in the

24  outcome of the cause named in said caption.

25          IN WITNESS WHEREOF, I have hereunto set my

1  hand and affixed my seal of office the 1st day of

2  June, 2008.

3

4

5  _____

6  LESLIE CASTRO
   C.S.R. No. 8876

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25