UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

ESTHER HWANG,

        Plaintiff,

  vs.               Case No. C07-02718 MMC

CITY AND COUNTY OF SAN FRANCISCO,
ET AL.,

        Defendants.

_____/

**CERTIFIED COPY**

Deposition of

NATHAN FLORES

Monday, April 28, 2008

REPORTED BY:  LESLIE CASTRO, CSR #8876

BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

1                          I N D E X

2

3    Deposition of NATHAN FLORES

4    Monday, April 28, 2008

5

6                                                        Page

7    EXAMINATION BY MR. CONNOLLY                         5

8

9

10

11

12

     Certified Questions:
13

                    Page              Line
14

15

16

17

18

19

20

21

22

23

24

25

1
               E X H I B I T S

2

3    Deposition of NATHAN FLORES

4    Monday, April 28, 2008

5

6    Defendant's          Description               Page

7    A    First Subpoena in a Civil Case        167

8    B    Second Subpoena in a Civil Case       167

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BE IT REMEMBERED THAT, pursuant to Notice, and on

2    Monday, April 28, 2008, commencing at the hour of

3    10:09 o'clock a.m. thereof, at the OFFICE OF THE CITY

4    ATTORNEY, Fox Plaza, Seventh Floor, 1390 Market Street,

5    San Francisco, California 94102, before me,

6    LESLIE CASTRO, a Certified Shorthand Reporter in and for

7    the State of California, personally appeared

8                    NATHAN FLORES

9    Called as a witness by the Defendant, who, being by me

10   first duly sworn, was thereupon examined and testified

11   as hereinafter set forth.

12

13   APPEARANCES:

14       LAW OFFICES OF JOHN L. BURRIS, 7677 Oakport Street,

15   Suite 1120, Oakland, California 94621, represented by

16   BENJAMIN NISENBAUM, Attorney at Law, appeared as counsel

17   on behalf of the Plaintiff.

18

19       OFFICE OF THE CITY ATTORNEY, Fox Plaza, Sixth

20   Floor, 1390 Market Street, San Francisco, California

21   94102, represented by SEAN F. CONNOLLY, Deputy City

22   Attorney, appeared as counsel on behalf of the

23   Defendant.

24   Also Present:  Michael Tunick, Videographer

25                    ---oOo---

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                         ---oOo---

3

4        THE VIDEOGRAPHER:  We're going on the record at

5   10:09 a.m.  It's April 28th, 2008.  Starting the

6   deposition of Mr. Nathan Flores in the matter of

7   Esther Hwang versus the City and County of

8   San Francisco, et al.

9        This is for the U.S. District Court, State of

10  California.  Case number C0702718 MMC.

11       Located at the San Francisco City Attorney's

12  Office.

13       The videographer is Mike Tunick in Rohnert Park.

14  I've been retained by the San Francisco City Attorney's

15  Office.

16       And if we could have our attorneys present please

17  introduce yourselves.

18       MR. CONNOLLY:  My name is Sean Connolly, Deputy

19  City Attorney on behalf of Officers Serna and Artiga and

20  the City and County of San Francisco.

21       MR. NISENBAUM:  My name is Ben Nisenbaum, one of

22  the attorneys for the plaintiff in this case Esther

23  Hwang.

24       MR. CONNOLLY:  Present also in the room is the

25  court reporter and Mr. Flores.
```

1              THE VIDEOGRAPHER:  Now, our witness can be sworn

2    in.

3                          NATHAN FLORES

4         being first duly sworn, testified as follows:

5

6    EXAMINATION BY MR. CONNOLLY:

7

8         MR. CONNOLLY:  Q.  Good morning Mr. Flores.

9         A.   Good morning.

10        Q.   I introduced myself shortly before we went on

11   the record.  I introduced myself and told you a little

12   bit about what we're going to do here today.  As you

13   know, this is a deposition in the matter of Hwang versus

14   City and County of San Francisco, et al.

15             And before I get into some of the other

16   preliminary instructions, I want to ask you to verify

17   two exhibits, which are -- I'll represent this is the

18   subpoena for your testimony in this case.  I'm going to

19   show you what's been marked as Exhibit A.

20             Have you seen that before or a copy of that?

21        A.   Yes.

22        Q.   And do you understand that to be the subpoena

23   compelling your appearance here today?

24        A.   Yes.

25        Q.   And I don't know if you saw this but it's

1  came back?

2      A.   Correct.

3      Q.   Now, you maintained your apartment, your flat

4  at Fairfax Way in South San Francisco during that month

5  of time?

6      A.   Yes.

7      Q.   Did Ms. Hwang live there while you were gone?

8      A.   Yes.

9      Q.   Do you know who paid the rent on the place

10  during that period?

11      A.   My grandmother.

12      Q.   And when do you recall the date of the bar in

13  July?

14      A.   26th, 27, 28 of July.

15      Q.   And you came back on the 29th --

16      A.   I think so, yes.

17      Q.   -- right around there?

18      A.   Yes.

19      Q.   Did you move back to Fairfax Way?

20      A.   Yes.  I didn't bring a lot of possessions.  I

21  mean, I could fit everything in my car, just enough

22  clothes, gear, books to study and that's it.

23      Q.   And you've been living at Fairfax Way ever

24  since?

25      A.   Yes.

1        Q.   Now, did Ms. Hwang live with you at any point
2   in time between January of '07 when you met her and
3   October, '07 when you guys broke up?
4        A.   Yes.
5        Q.   From when to when?
6        A.   When she moved into my house?
7        Q.   Yes.
8        A.   I would say sometime in the middle of March.
9        Q.   But shortly before the incident?
10       A.   (Witness nods head.)
11       Q.   "Yes"?
12       A.   Yes.
13       Q.   Until when, approximately?
14       A.   Until she moved down to L.A. to do the same
15   bar review course that I did.
16       Q.   Do you know when that was?  In other words,
17   was it the same time you moved out?
18       A.   No.  I came -- well, because I came back in
19   July and we lived together for a while.  And then she
20   moved -- I believe it was October 10th that she moved
21   down to Irvine.
22       Q.   I see.  Okay.
23            So let me just see if I have this right.
24            You met in January of '07.
25       A.   Yes.

1    Q.    You became romantically involved in I think

2    you said March; do I have that right?

3    A.    That's when she moved in.

4    Q.    When did you guys start dating again?

5    A.    In January.

6    Q.    I thought you met in January?

7    A.    No, we met in '04.

8    Q.    You did?  I apologize for that I see that in

9    my notes.  I misunderstood that.

10    You started dating in January of '07?

11    A.    Correct.

12    Q.    She moved in sometime in March of '07?

13    A.    Yes.

14    Q.    You guys were living with each other through

15    May when you moved down to Irvine to study; is that

16    right?

17    A.    Correct.

18    Q.    She stayed in your apartment during that

19    period of time?

20    A.    Yes.

21    Q.    You returned at the end of July or early

22    August to South San Francisco?

23    A.    Yes.

24    Q.    At which point you continued living with each

25    other?

1      A.    Yes.

2      Q.    And then she moved out sometime in October to

3  go down to Irvine to study for the bar?

4      A.    Yes.

5      Q.    And how soon after she left to go to Irvine

6  did you guys break up?

7      A.    I'd say maybe three weeks.

8      Q.    And do you know if she took the July bar?

9      A.    She did not.

10      Q.    How would you characterize your relationship

11  with Ms. Hwang now, today?

12      A.    It's amicable.  We don't talk on a regular

13  basis, but I don't have any ill feelings towards her.

14      Q.    Was there any animosity over the breakup?

15      A.    For a little while.

16      Q.    And coming from who, you or her?

17      A.    I think both of us.

18      Q.    And where do you think it derived, its source

19  from that animosity?

20      A.    I guess just the -- the incident itself, and

21  the fact that I felt like it just wasn't a good thing

22  for us to be together.

23      Q.    And who broke up with who?

24      A.    I believe it was her that broke up.

25      Q.    She broke up with you?

1    A.    Yes.

2    Q.    What did you mean about the incident having a

3 roll in this?  Can you elaborate on that?

4    A.    Yes.  She said she believed that I didn't care

5 about her.  Because shortly after the incident I left to

6 study for the bar.  And it was something that I had

7 planned on since February and that date was set since

8 February of '07.  And she -- it was her feeling that I

9 should have not gone to study for the bar and stayed

10 there with her.

11    Q.    And that started to -- over time to develop

12 into something more and cause you -- ultimately --

13 caused ultimately to be a big role in your breaking up?

14    A.    I wouldn't say it was the biggest role, but it

15 was definitely a factor.

16    Q.    What were the biggest roles?

17    A.    Just the fact that we didn't get along any

18 more.

19    Q.    Going back to last Friday or last Wednesday,

20 were you surprised to hear from Ms. Hwang?

21    A.    Yes.

22    Q.    And is that because you hadn't heard from her

23 in some time or hadn't been speaking to her on a regular

24 basis?

25    A.    Yes.  And actually, I have to go back and

1      A.   No.

2      Q.   Did you get the coats?

3      A.   I did.

4      Q.   And how did you retrieve them?  Did you give

5  them a ticket or something else?

6      A.   Yes.  I gave the coat check person the ticket

7  and I got the coats.

8      Q.   How long did that take -- that's a bad

9  question.

10      How long did it take from the point in time

11  you left the area there front of the liquor store and

12  got the coats?

13     A.   Two minutes.

14     Q.   After you got the coats, what did you do?

15     A.   I walked back out to where she was.

16     Q.   And when you walked out -- and you obviously

17  walked outside of the immediate area of Dolche?

18     A.   Yes.

19     Q.   Did you at that point look up and see her or

20  did you continue walking toward her before you noticed

21  her?

22     A.   I looked up and saw her.

23     Q.   And what did you see at that point?

24     A.   She was sitting on the sidewalk with handcuffs

25  behind her back.

1    Q.   Okay.

2         You come out of Dolche, you have both of your

3    coats in your hand or was your coat on?

4    A.   I had mine own.

5    Q.   And your best recollection -- this has been

6    how many minutes since you last saw her?

7    A.   I would say from the time I left her to the

8    time I got the coats and came back and saw her again, no

9    more than five minutes.

10   Q.   So less than five minutes later, the first

11   thing you see is her sitting on the ground --

12   A.   Yes.

13   Q.   -- I think is what you said, handcuffed behind

14   her back?

15   A.   Yes.

16   Q.   Was she -- do you recall -- now, take that as

17   a picture in your mind, just that point in time.  We'll

18   talk about what happens after that as we go.

19        But do you recall which direction she was

20   facing?  In other words, if you could be facing west or

21   east or somewhere in between?

22   A.   She was facing the street.

23   Q.   With her back then to the building?  I don't

24   mean to her say her back was against the building line,

25   but her back was back toward the building line and she

1    was facing the street?

2         A.    Correct.

3         Q.    Do you recall where on the sidewalk, middle of

4    the sidewalk, on the curb, near the building line?

5         A.    Near the edge of the curb.

6         Q.    How far from the curb?

7         A.    About a foot.

8         Q.    And was there anyone around her?

9         A.    No.

10        Q.    Were there -- did you see any police officers?

11        A.    The police officers were in the vicinity, but

12   they weren't standing, you know, I'd say more than a

13   three feet radius away.

14        Q.    They were at least three feet away?

15        A.    Yes.

16        Q.    Do you recall who was three feet away?

17        A.    All of them.

18        Q.    Do you have any specific recollection given

19   that picture -- in other words, the first thing you saw

20   as you came out of Dolche and looked toward the liquor

21   store which officers were positioned where or do you

22   have any recollection?

23        A.    I don't have a recollection.

24        Q.    What did you do next when you saw that?

25        A.    I asked "What happened?"

1    Q.   Did you walk up to them?

2    A.   Yes.

3    Q.   So you walked up to them.

4    A.   Yes.

5    Q.   And I think you said the distance was 50 or 70

6    feet or something?

7    A.   Yes.  From Dolche to where she was located.

8    Q.   And of the -- when you say -- point of

9    clarification for my purposes:

10        Was she sitting on the sidewalk with handcuffs

11   behind her back in front of the liquor store or was

12   there any point between the liquor store and Dolche?

13   A.   No.  It was in front of the liquor store.

14   Q.   So it was roughly the same distance that you

15   described earlier, 50 to 70 feet?

16   A.   Yes.

17   Q.   When you saw her, you walked towards her and

18   the officers and you said -- I'm sorry, repeat what you

19   said.

20   A.   I said, you know, "What happened?"

21   Q.   You asked "What happened?"  Who did you ask

22   that of?

23   A.   I don't know.  One of the officers.

24   Q.   So describe what happened?

25   A.   Well, they just said, "She was getting

1  belligerent and she tried to cross the street." And she

2  said something along the lines, like, "Oh, so if I cross

3  the street, I guess, you guys are going to have to

4  tackle me?"

5      Q.   So this is what one of the police officers

6  told you at that point in time?

7      A.   I don't -- yeah. I don't think they said --

8  they didn't talk about the tackling part. But they just

9  said that "She was belligerent and that she's

10 intoxicated and that she tried to cross the street."

11     Q.   And that was immediately after you walked up

12 to them?

13     A.   Yes.

14     Q.   And you asked the question of some officer or

15 generally of all the officers?

16     A.   It was one of the officers, but I don't recall

17 who it was.

18     Q.   And that's what was repeated back to you

19 immediately or was there any --

20     A.   Yes.

21     Q.   So what happened at that point?

22     A.   Then I went to talk to her.

23     Q.   To Esther?

24     A.   Yes, to Esther.

25     Q.   Now, did you just walk over or did you ask if

1  it was okay to go talk to her or did someone tell you to

2  talk to her?  How did that work?

3      A.    I just walked over and started talking to her.

4      Q.    And did that seem to be okay with the police?

5      A.    Yes.

6      Q.    Now, what condition was she in at that point?

7      A.    She was --

8      Q.    In other words, I'm talking about when you

9  first walked up to her, did you say anything to her?

10      A.    I did.

11      Q.    Let's use that as a time frame.  Before you

12  said anything to her, tell me what she appeared as, what

13  did she look like at that point?

14      A.    I think she was crying.  She looked, you know,

15  upset.  She looked lost, like, she didn't know what was

16  going on.

17      Q.    What did her hair look like?

18      A.    Same.

19      Q.    What did her hair look like that night any

20  ways?  How did she wear it?

21      A.    I think she had it up.

22      Q.    What does that mean?

23      A.    Like -- I don't know, rolled up in a bun or

24  something.

25      Q.    Was her hair rolled up in a bun at that point?

1    A.    It was a little messy.  But I think it was

2  generally still in the same place as it was before.

3    Q.    When you say it was "Rolled up in a bun," does

4  that mean --

5    A.    It was tied up.  It was tied up somehow.

6    Q.    I don't know what she looked like at the time

7  of the arrest, but did she have long hair, longish hair?

8    A.    Yes.

9    Q.    Hair that extended below her shoulders?

10   A.    Yes.

11   Q.    Okay.

12         And when you say it was "Up in a bun," are you

13  saying the whole -- all of her long hair was tied up in

14  some form of a bun?

15   A.    You know what, now that I'm thinking about it,

16  I'm thinking about those pictures that I took.  And it

17  wasn't up.  Actually, it was down.

18   Q.    So she was wearing --

19   A.    Her hair was down that day.

20   Q.    Does she have straight hair or frizzy hair?

21   A.    Straight.

22   Q.    Was there anything about her hair that you

23  noticed at that point in time that was different from

24  what she had looked like from when you had seen her

25  last?

1    A.    No.

2    Q.    How about what she was wearing?

3    A.    She was wearing a skirt and a, like, a tank
4    type and it had come down a little bit.

5    Q.    When you say "Come down a little bit," what do
6    you mean?

7    A.    It was like sliding down.  Her breasts were
8    almost exposed.

9    Q.    Was it just cleavage or were her breasts fully
10   exposed?

11   A.    Just cleavage.

12   Q.    When you went up to her, what happened?

13   A.    I told her -- I said, "Just sit here.  Don't
14   fight, don't argue with these guys.  Just let them, you
15   know -- just don't fight them."

16   Q.    Was she fighting them?

17   A.    No.

18   Q.    Why did you say that?

19   A.    I just had -- because it was, like, "I want to
20   go.  I want to get out of here. I want to leave."

21         And I said, "No, just stay here.  Don't fight
22   it, don't argue with anybody."

23   Q.    You said she was crying and upset when you
24   approached her.

25         Was she saying anything to you other than "I

1  want to leave, I want to go?"

2      A.    Yeah.  She started yelling at the officers

3  saying stuff, like, you know, "I know Willie Brown.  I'm

4  going to get you guys in trouble."

5      Q.    What else?

6      A.    That's all I recall.  And that's when I told

7  her "Don't argue, don't say anything.  Just sit here."

8      Q.    So she said this as you walked up to her when

9  she was on the sidewalk in a handcuffed position?

10      A.    Yes.

11      Q.    And did you hear her say "I know" -- words to

12  the affect "I know Willie Brown and I'm going to get you

13  guys in trouble"?

14      A.    Yes.

15      Q.    Did she yell it, was she yelling at the

16  officers?

17      A.    Yes.  She screaming at the officers.

18      Q.    When you say screaming, I'm assuming it was

19  loud?

20      A.    Loud.

21      Q.    And how many times did she say it?

22      A.    At least two that I can remember.

23      Q.    Did she utter other forms of threats to her --

24  to them?

25      A.    No.

1      Q.    Did she say how she was going to get them in

2   trouble?

3      A.    No.

4      Q.    But you do recall her saying words to that

5   effect?

6      A.    Yes.

7      Q.    And you're clear about that?

8      A.    Very clear.

9      Q.    How were the officers reacting to that?

10     A.    They just ignored her.

11     Q.    So -- and you said to her words to the effect

12  here "Don't argue with them, don't fight."

13          What happened next after that?

14     A.    And then she was trying to get up and I said,

15  "Don't get up."

16          And the officer -- I think it was Officer

17  Serna said, you know, "Don't get up.  Just sit there."

18          And then she was still, kind of, moving around

19  and he walked up, grabbed her by the hair and pulled her

20  hair and said, "Sit down you fucking cunt.  Otherwise,

21  you know, I'm going to take you away."  Or something

22  like that.  I know that's what he said though because I

23  couldn't believe he said that.

24     Q.    At this point you're within her immediate

25  vicinity?

1      A.    Yes.

2      Q.    You've heard her at this point say something

3  to the effect that "I know Willie Brown and I'm going to

4  get you guys in trouble."

5            And she's screaming at them?

6      A.    (Witness nods head.)

7      Q.    Is that a "yes"?

8      A.    Yes.

9      Q.    You say she starts to get up or move around.

10           Can you describe that?

11     A.    She -- well, she was in the handcuffs so she

12  couldn't really push herself up.  But she was, kind of,

13  squirming around and looked like she was attempting to

14  get up.  And that's when Officer Serna came over and

15  grabbed her by the hair.

16     Q.    Was it your understanding that she had been

17  told to sit down at that point or told to stay there?

18     A.    Yes.

19     Q.    Did you hear anyone direct her to do that?

20     A.    Yeah, I did.

21     Q.    Who, officers?

22     A.    Yeah, one of the officers.

23     Q.    Directed her to stay put or remain seated?

24     A.    Yes.

25     Q.    So then she starts to get up.

1           Who told her to stay there or to not get up?

2       A.   I don't remember who it was.

3       Q.   But you heard voices?

4       A.   Yes.

5       Q.   And they were coming from one of the police

6   officers?

7       A.   Yes.

8       Q.   At that point, you said you saw Officer Serna?

9       A.   Yes.

10      Q.   Are you sure it was Serna?

11      A.   He was -- I don't know if it was because I

12  know also Officer Artiga grabbed her and said something

13  that I couldn't hear.

14      Q.   I'm sorry, go ahead.

15      A.   While I was still standing right there.  While

16  I was talking -- so I was talking -- after that

17  happened, I said, you know, "You guys don't have to talk

18  to her like that.  That's not appropriate."

19           And then Serna came over to me and said, "You

20  need to step away."  And at that time I saw Artiga go up

21  and grab her and also say something to her that I could

22  not hear.

23      Q.   So I want to go back over this and get this

24  down exactly as you remember it.

25           You're standing over her or standing next to

1   her?

2        A.   I'm kneeling down next to her.

3        Q.   Kneeling next to her.

4             She's uttered words -- she's screaming

5   something about Willie Brown and getting you guys in

6   trouble.

7             A police officer that you think is Serna comes

8   up to her?

9        A.   It was either Serna or Artiga because those

10  two were the main aggressors.

11       Q.   Let's talk about the first officer that came

12  up.

13            You're saying a police officer came up and

14  grabbed Esther by the hair?

15       A.   Yes.

16       Q.   Where on her hair?

17       A.   On the back of her hair and, kind of, tugged

18  her hair back (indicating).

19       Q.   With how much force would you say that he did

20  that?

21       A.   More than was necessary.

22       Q.   What would have been necessary?

23       A.   Just to talk to her and tell her "Just sit

24  still."

25       Q.   Was the force used to direct her back to the

1    ground and get her to stay seated or what?

2        A.    Well, she was still seated.

3        Q.    But she was trying to get up?

4        A.    Not at that point.

5        Q.    So this officer grabbed her hair?

6        A.    Uh-huh.

7        Q.    Pulled it back?

8        A.    Yes.

9        Q.    And at that point leaned to her and said, "Sit

10   down you fucking cunt"?

11       A.    Yes.

12       Q.    When you said -- is that an exact quote?  I

13   think you said later that person said something like

14   that?

15       A.    No.  That's the exact quote.  I distinctly

16   remember hearing that.

17       Q.    How many times was that uttered?

18       A.    Once.

19       Q.    Did it surprise you?

20       A.    Yes.

21       Q.    Did you turn to see who it was who said it?

22       A.    Yes, I did.  Well, I was standing right there

23   when the officer did that.

24       Q.    Okay.  And who did you see?

25       A.    It was -- I think it was Artiga or I think it

1  was Serna.  I just can't remember.  But I know those two

2  were the main aggressors and those were the ones

3  standing around her.

4      Q.   So when you said -- so this comment you can't

5  attribute to one or the other, but it's definitely one

6  or the other?

7      A.   Yes.

8      Q.   In other words, you can't say it was Serna or

9  Artiga, but you think it had to be one or both of them?

10     A.   Yes.

11     Q.   It had to have been one or the other of them?

12     A.   Right.

13     Q.   So whether that first officer -- can you say

14  with any certainty whether the comment you heard, "Sit

15  down you fucking cunt," came from the same officer that

16  pulled her hair, did the hair pull take-down?

17     A.   Yeah.  He pulled her hair and then said that

18  to her.

19     Q.   Same person?

20     A.   Yes, same person.

21     Q.   And then you stood up and said something about

22  that not being necessary?

23     A.   Yes.

24     Q.   And they told you to back away?

25     A.   Yes.

STATE OF CALIFORNIA )

) Ss.

COUNTY OF CONTRA COSTA )

        I hereby certify that the witness in the foregoing deposition, named NATHAN FLORES, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me,

                    LESLIE CASTRO,

A Certified Shorthand Reporter and disinterested person, and was thereafter transcribed into typewriting; and that the pertinent provisions of the applicable code or rules of civil procedure relating to the notification of the witness and counsel for the parties hereto of the availability of the original transcript of deposition for reading, correcting and signing have been complied with.

        And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

        IN WITNESS WHEREOF, I have hereunto set

1    my hand and affixed my seal of office the 15th day of

2    May, 2008.

3

4

5                          _____

6                          LESLIE CASTRO
                           C.S.R. No. 8876
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25